**Gloria PFOLTZER, et al., Plaintiffs,**

v.

**COUNTY OF FAIRFAX,
et al., Defendants.**

**Civ. A. No. 90–1706–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 11, 1991.

---

John M. DiJoseph, Slatter & DiJoseph, Arlington, Va., for plaintiffs.

Edward E. Rose III, Asst. County Atty., Fairfax, Va., Jessie James Jr., Burke, Va., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Among the state's many powers, none is more fearsome than the power to take a child away from a parent. Challenged exercises of this power deserve close judicial scrutiny. This, in general, describes the case at bar. It is a case in which a mother and her children claim that the state violated their federal constitutional rights when it removed the children from their parents' custody and placed them in foster care, where they were allegedly abused and deprived of the right to the free exercise of their religion.

More particularly, this is an action under 42 U.S.C. § 1983 brought by plaintiff Glo-

ria Pfoltzer, and three of her minor children, challenging the state's actions in removing the children from the Pfoltzer home on or about January 13, 1989. Specifically, plaintiffs claim that the defendants'[1] actions in this regard violated the Constitution and a federal statute. They further claim that the children, while in foster care, were abused and denied access to their Roman Catholic faith. The Amended Complaint asserts (i) Fourteenth Amendment substantive and procedural due process claims, (ii) a First Amendment free exercise claim,[2] (iii) a claim based on a violation of the Adoption Assistance and Child Welfare Act of 1980, and (iv) a civil conspiracy to violate the rights protected by these laws. The individual defendants are sued in their personal capacities.

This matter comes before the Court on defendants' Motion for Summary Judgment[3] and plaintiffs' cross-motion for Partial Summary Judgment with respect to the allegedly unlawful removal of the children from the Pfoltzer home on January 13, 1989. For the reasons stated from the bench and amplified here, the Court concludes that plaintiffs have failed to establish any violation of federally-protected rights.[4] Accordingly, defendants' motion must be granted and plaintiffs' motion denied.

## Background

On May 27, 1988, the Fairfax County Juvenile and Domestic Relations District Court ("J & D court") issued an emergency removal order directing that Lisa, Theresa, Randy, and Christopher Morris, plaintiff Gloria Pfoltzer's children by a prior marriage, be placed in the legal custody of the Fairfax County Department of Social Services (the "Department").[5] This action was based on sworn allegations that Daniel Pfoltzer, Gloria Pfoltzer's second husband, subjected the children to violent and unduly embarrassing disciplinary methods, and that Gloria Pfoltzer either contributed to or acquiesced in the use of these methods. On June 3, 1988, the court held a preliminary removal hearing, at the conclusion of which it ordered that custody of the chil-

1. The individual defendants are Suzanne Manzo, Director of the Department of Human Development; Paulette Bird, a social worker in the department; and Florence Hannigan, also a social worker in the department and Ms. Bird's supervisor. Defendant Louis Villafane, an employee of an outside company under contract to the County, was dismissed from the case on plaintiffs' request.

2. Fleeting mention of a free speech claim appears only in the heading of Count I of the Amended Complaint. It is neither articulated in the body of the complaint nor pressed by plaintiffs in their memoranda and oral argument. The Court therefore construes this claim as hortatory and does not address it here.

3. Defendants' motion also incorporates elements of a previously-filed motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P. Chief among these is defendants' contention that the complaint fails to state a claim under § 1983 against defendants Manzo or Fairfax County. Because the Court concludes that plaintiffs' substantive rights were not violated, it is unnecessary to reach these issues.

4. Given this, the Court need not address the civil conspiracy alleged in count II. Nevertheless, the Court notes that it is doubtful whether this count could survive summary judgment because plaintiffs fail to support the broad, vague allega-

tions set forth in the complaint. In *Donald v. Polk County*, 836 F.2d 376 (7th Cir.1988), parents alleged that state officials conspired to remove their daughter from the household by creating the false impression that the daughter had been abused. The Seventh Circuit panel suggested that the parents' claim of conspiracy did not present a genuine issue of fact because the parents did not point to any specific falsities in the officials' reports or testimony and proposed no reasonable motive for why defendants would be prejudiced against them, citing *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985) ("[A]lthough summary judgment is usually not proper in a case involving a weighing of conflicting questions of motive and intent, summary judgment is proper where the plaintiff presents no indications of motive and intent supportive of his position."). Here, plaintiffs similarly present no motive to explain why defendants would conspire to remove the children. Plaintiffs have submitted the handwritten comment of defendant Bird: "Look what a little collusion accomplishes!?!" Apparently, this comment was directed to defendant Manzo and appeared at the bottom of a letter to Bird from guardian *ad litem* James E. Wilcox, Jr. This comment may support an inference of conspiracy, but it sheds no light on motive.

5. On December 12, 1988, the Department was reorganized into its current incarnation as the Department of Human Development.

dren remain with the Department. Trial was set for August 5, 1988.

Just prior to trial, the Pfoltzers and defendants agreed to a consent order that was subsequently entered by the J & D court.[6] In pertinent part, the order provided: (i) that the parties agreed that Daniel Pfoltzer's methods of discipline were "inappropriate" and that Gloria Pfoltzer had been aware of them but did not intervene; (ii) that it was the parties' "intention to make a determination" to return the three plaintiff children home, contingent on certain factors; (iii) that "temporary legal custody of [the children] shall continue in the Department until further order of the court;"[7] and (iv) that Gloria and Daniel Pfoltzer would cooperate with Home Based Services, actively participate in therapy with a Dr. Broars, and have the children participate in therapy with a Dr. Federici. Following entry of the consent order, Randy, Theresa, and Christopher were returned to the Pfoltzer home on August 26, 1988.[8]

During the weeks that followed, various defendants obtained information they believed showed that the Pfoltzers were not complying with the consent order. On January 12, 1989, the individual defendants (except Manzo) and others, including an Assistant Fairfax County Attorney and the guardian *ad litem* for the children, held a meeting to discuss the situation. As a result of this meeting, defendants decided to remove the children from the Pfoltzers' physical custody.[9] To this end, defendants Bird and Manzo sent the Pfoltzers a letter of removal dated January 13, 1989. The gist of the letter was that removal of the children from the home was necessary in the Department's view, because the Pfoltzers had failed to fulfill their responsibilities under the consent order. The children were then removed to foster care on or about that date. It is during this second period of foster care that plaintiffs claim that the children suffered abuse and abridgement of their free exercise rights.

In March, 1989, some two months after the children's removal from the home, the J & D court held a three-day hearing on the original May 27, 1988, petitions to have the children declared abused and/or neglected. After hearing the testimony of witnesses and considering the evidence, the J & D court ruled, *inter alia*, that the Department had established by clear and convincing evidence that the children were "in need of services" within the meaning of Virginia Code § 16.1–279(C);[10] that the

6. Gloria Pfoltzer and the Department were represented by counsel. Daniel Pfoltzer appeared *pro se*. A guardian *ad litem* appeared for the children.

7. Va.Code § 16.1–228 provides in pertinent part that

"Legal custody" means (i) a legal status created by court order which vests in a custodian the right to have physical custody of the child, to determine where and with whom he shall live....

8. The fourth and oldest child, Lisa Morris, remained in foster care. No longer a minor, she is not a plaintiff in this case.

9. Defendants believed that the Department's legal custody of the children permitted their removal without a court order. For this reason, they did not petition the J & D court for an order to show cause why the Pfoltzers should not be found in contempt for violations of the consent order.

10. At the time of the hearing, Va.Code § 16.1–279(C) provided, in pertinent part, that:

If a child is found to be in need of services, the juvenile court or the circuit court, as the case may be, may make any of the following order of disposition for the supervision, care and rehabilitation of the child:

. . . .

2a. Order the parent, guardian, legal custodian or other person standing in loco parentis of a child living with such person to participate in such programs, cooperate in such treatment or be subject to such conditions and limitations as the court may order and as are designed for the rehabilitation of the child and parent, guardian, legal custodian or other person standing in loco parentis of such child.

. . . .

5. Transfer legal custody to any of the following:
a. A relative or other individual who, after study, is found by the court to be qualified to receive and care for the child.
b. A child welfare agency, private organization or facility which is licensed or otherwise is authorized by law to receive and provide care for such child; ...
c. The local board of public welfare or social services of the county or city in which the

parents had in fact declined services; that reasonable efforts had been made to prevent removal; that continued placement in the home would be contrary to the children's welfare; and that "legal custody of [the children] shall continue with the Department." *In Re Lisa, Randy, Theresa and Christopher Morris*, No. 086896–P,Q,R,S, at 2 (May 4, 1989). No appeal was taken from this order.

Over the next year and a half, the Pfoltzers filed various motions for return of custody and modification of visitation conditions. So far as the record discloses, these motions were denied. One denial resulted in an appeal to Judge Fortkort of the Fairfax County Circuit Court, who issued an order stating, *obiter dictum* and without explanation, that the January 13, 1989, removal was unconstitutional.[11] Notwithstanding this statement, Judge Fort-

kort ruled that the children should not be returned to the custody of Gloria Pfoltzer, given the J & D court's determination that the children were in need of services and Gloria Pfoltzer's failure to appeal that decision. While custody remained with the Department, the visitation schedule was modified from time to time by agreement of the parties. In May 1990, the Department consented to the children's return to the Pfoltzer home. Thereafter, legal custody was formally restored to Gloria Pfoltzer by consent order in December 1990.

As set forth here, the essential history and material facts of the case are undisputed. Yet three matters are hotly contested. They are: (i) whether the Pfoltzers violated the terms of the consent order;[12] (ii) the nature of defendants' meeting of January 12, 1989;[13] and (iii) whether the children

court has jurisdiction.... The board to which the child is committed shall have the final authority to determine the appropriate placement for the child. Any order authorizing removal from the home and transferring legal custody of a child to a local board of public welfare or social services as provided in this subdivision shall be entered only upon a finding by the court whether reasonable efforts have been made to prevent removal and that continued placement in the home would be contrary to the welfare of the child, and the order shall so state.

Va.Code § 16.1–228 defined "child in need of services" in pertinent part as

[a] child whose behavior, conduct or condition presents or results in a serious threat to the well-being and physical safety of the child.... However, to find that a child falls within any of classes 1, 2, 3 or 5 above (i) the conduct complained of must present a clear and substantial danger to the child's life or health or (ii) the child or his or her family must be in need of treatment, rehabilitation or services not presently being received and (iii) the intervention of the court must be essential to provide the treatment, rehabilitation or services needed by the child or his family.

The substance of former Va.Code § 16.1–279(C) may now be found in Va.Code § 16.1–278.4.

11. This Court declined to give preclusive effect to this statement. *See Pfoltzer v. Fairfax County*, No. 90–1706–A, Order dated May 17, 1991.

12. As reflected in defendants' memoranda and various affidavits, it became apparent during in the fall of 1988 that Gloria and Daniel Pfoltzer were increasingly unwilling to abide by the

terms of the consent order. According to defendants, the Pfoltzers refused to allow the children to see their therapist, refused to allow their own therapist to discuss matters with the Department or with Community Based Services (a private social services company with which the county had contracted to provide services to families), were argumentative and combative with the Department, became opposed to home visits by Community Based Services, and indicated that they were no longer going to participate in the treatment plan.

Plaintiffs dispute this version of events by their joint affidavit and that of Community Based Services worker Mary Carter. Based on the averments in these affidavits, plaintiffs contend that they complied fully with the consent order, though they also publicly criticized the Department in certain respects. They state further that the Department could have, and did, communicate with Dr. Broars through Mary Carter and that Dr. Federici withdrew from the case because plaintiffs filed a complaint against him.

13. According to defendants' memoranda and affidavits, the meeting focused on the allegedly deteriorating situation in the Pfoltzer home, and those present concluded that the best course of action was to remove the children to foster care for their safety. Defendants believed they had the authority to do this without further hearings because the Department had temporary legal custody of the children. Plaintiffs dispute this characterization of the meeting and allege that defendants met specifically for the purpose of conspiring to effect an unlawful removal of custody.

were abused while in foster care.[14] As explained here, however, disposition of the instant motions does not require the Court to resolve these issues.

The principal issues raised by the pending motions are (i) whether the removal of the children and restriction to supervised visitation violated plaintiffs' due process rights; (ii) whether these events violated plaintiffs' substantive due process rights; (iii) whether defendants actions denied plaintiffs the right to the free exercise of religion; (iv) whether individual defendants are entitled to qualified immunity; and (v) whether defendants violated the Adoption Assistance and Child Welfare Act of 1980.

*Analysis*

### I. Constitutional Issues

#### A. Procedural Due Process

##### 1) *The January 13, 1989 Removal*

■ Plaintiffs place great emphasis on the constitutional protection afforded to family life and the raising of children. This emphasis is not inappropriate. There can be little doubt that Gloria Pfoltzer has a constitutionally protected liberty interest in the care and custody of her children, and that all plaintiffs have a similar liberty interest in family integrity. *See Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). But identifying a protected liberty interest only begins a procedural due process analysis. Liberty interests are not absolute; they may, with due process, be infringed or taken away in certain circumstances. Thus, the second step in the analysis is to ascertain the nature of the process that was due plaintiffs. *See Mathews v. Eldridge*, 424 U.S. 319, 333–34, 96 S.Ct. 893, 901–02, 47 L.Ed.2d 18 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In this respect, plaintiffs fail; they have not shown that they were accorded less than the process they were due.

■ First, although their complaint is ambiguous on the point, plaintiffs contend in their memoranda that defendants violated Virginia law. It is settled, however, that violations of state law cannot provide the basis for a federal due process claim. *See Weller v. Dept. of Soc. Serv. for Baltimore*, 901 F.2d 387, 392 (4th Cir.1990); *Clark v. Link*, 855 F.2d 156, 161–63 (4th Cir.1988).

■ Second, defendants argue persuasively that plaintiffs waived their procedural due process rights. In *Weller*, the Fourth Circuit held that an allegedly abusive father complaining about losing custody of his son failed to state a claim for a procedural due process violation, because the father had voluntarily surrendered his son to a social services agency. The court reasoned that in those circumstances the state did not deprive the father of his liberty interest inherent in family integrity. "If one voluntarily surrenders a liberty interest to the State, there has been no 'deprivation' of that interest by the State, and no due process violation." *Id.* at 393 (citing *Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167, 172–73 (4th Cir.1988)).[15] Similarly, in this case the

---

**14.** Plaintiffs allege that once in foster care, the children were not permitted to communicate with their mother for a month. Thereafter, only supervised visitation was permitted. Plaintiffs further allege that defendants refused Gloria Pfoltzer's requests that the children be afforded an opportunity to practice their Roman Catholicism. Specifically, plaintiffs allege the children were not allowed to attend either Mass on Sundays and holidays or weekly religious instruction classes in a Catholic parish. Plaintiffs also allege that the children suffered physical abuse at the hands of certain foster parents.

Defendants dispute these contentions, noting that the children were permitted to practice their Catholic religion during the period of fos-

ter care and that the alleged incidents of abuse were investigated and found to be either unfounded or *de minimis*. They further contend that the supervised visitation was appropriate in the circumstances.

**15.** The Fourth Circuit sharply distinguished this fact situation from the father's second claim that defendants transferred custody of the child to a grandmother and then to the mother without affording the father even a postponed opportunity for a hearing. Because there was no voluntary surrender in these instances, the court held that this second allegation stated a procedural due process claim. *Weller*, 901 F.2d at 392–96.

Pfoltzers voluntarily surrendered their liberty interest by giving the Department "legal custody" of their children in the consent order. The Pfoltzers may have believed that the Department would not act under this authority. They were undoubtedly aware, however, that (1) the Department could change the children's placement, see Va.Code § 16.1–228 (" 'Legal custody' means (i) a legal status created by court order which vests in a custodian the right ... to determine where and with whom [the child] shall live"); and (2) their receipt of physical custody was contingent on their compliance with the terms of the consent order. Plaintiffs offer no facts or persuasive arguments to distinguish this case from *Weller.*

Third, even assuming that plaintiffs did not waive their liberty interest, they had available to them post-deprivation procedural safeguards sufficient to satisfy due process concerns. Persuasive here is *Fitzgerald v. Williamson,* 787 F.2d 403 (8th Cir.1986), in which parents sued state agency employees for failure to provide the parents with a hearing before reducing the parents' visits with the child and prior to permitting the child to remain with her agency-selected foster parents. As in the instant case, the agency had previously acquired legal custody of the child. The Eighth Circuit held that Missouri law, which allowed a post-deprivation petition for modification of custody to the juvenile court at any time, provided adequate due process protection.[16]

Also persuasive is *Gibson v. Merced County Dept. of Human Resources,* 799 F.2d 582 (9th Cir.1986). In that case, parents and their adopted daughter brought a § 1983 action against a county agency for procedural due process violations, alleging that the agency obtained an *ex parte* order authorizing removal of the daughter during a period in which she was the parents' foster child. The court concluded that the procedures employed by the defendants and available to the plaintiffs were sufficient to satisfy procedural due process. In particular, the court noted (i) that the agency sought the removal order only after it discovered that the foster parents had indicated an intent to violate the state court order providing for eventual reunification of the child with her natural mother; and (ii) that the parents had a continuing opportunity to contact the state court that issued both the initial and *ex parte* orders. "In these circumstances, we conclude that due process did not require a full hearing before the court could order Susan removed from the Gibson home." *Id.* at 588.

The same result obtains here; it appears that Virginia law permits post-deprivation petitions for modification of custody. *See* Va.Code § 16.1–282 (any interested party, including a parent, may petition court within sixteen months after a child's initial foster care placement to review the circumstances of the placement); § 63.1–204.1 (circuit and juvenile courts have authority to grant visitation rights to parents of children committed to foster care). Indeed, the record reflects that the Pfoltzers petitioned for custody and visitation modifications on several occasions. That these motions failed is irrelevant to whether the state accorded plaintiffs adequate due process. Moreover, as in *Gibson,* the Department sought to remove the Morris children from the Pfoltzer home only after it received evidence that, in its view, indicated an intent to violate the consent order. The Pfoltzers certainly had the opportunity to petition the J & D court to complain that the Department was violating the consent order by removing the children from their home. Accordingly, absent any facts to distinguish this case from *Gibson* and *Fitz-*

---

**16.** In so holding, the Eighth Circuit implicitly balanced the factors enumerated in *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903:

First, the private interest that will be affected by the initial action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burden

*gerald*,[17] plaintiffs cannot establish a procedural due process violation stemming from the removal of the children.

### 2) *Supervised Visitation*

 The Amended Complaint alleges that defendants also violated plaintiffs' procedural due process rights by restricting the Pfoltzers to supervised visitation with the children following the January 13, 1989, removal from the home. Defendants' arguments are persuasive in this context as well. First, the record reflects that the visitation procedures outlined in the January 13, 1989, removal letter were in effect reviewed by the J & D court on February 16, 1989. Thus, the court penned the following ruling on the Department's motion to delete the requirement that the Pfoltzers be afforded visitation with the children every other Saturday in the Pfoltzer home: "Supervised visitation of all children by DSS may take place anywhere the Dept. deems appropriate and under such conditions as the Dept. deems appropriate." It appears from the record, therefore, that the issue of supervised visitation received appropriate judicial scrutiny. In any event, here, as in *Fitzgerald* and *Weller*, the availability of adequate post-deprivation remedies satisfied the procedural due process requirements in the visitation context.[18] *See Weller*, 901 F.2d at 394.

### B. Substantive Due Process

#### 1) *January 13, 1989, Removal and Visitation*

 Read liberally, the Amended Complaint alleges that the removal of the children from the Pfoltzer home and the restriction of the Pfoltzers to supervised visitation thereafter constituted a violation of substantive due process.[19] The substantive component of the Due Process Clause "bar[s] certain government actions regardless of the fairness of the procedures used to implement them ... [and thereby] serves to prevent governmental power from being used for purposes of oppression." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (citations omitted). " 'Because due process of law, as a historic and generative principle, precludes defining,' there are no precise standards for determining what governmental actions are proscribed by substantive due process." *Fitzgerald v. Williamson*, 787 F.2d at 408 (quoting *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952)). Accordingly, the applicable standard appears to be the *Rochin* "shock the conscience" test, sometimes expressed in terms of "fundamental fairness." *See Weller*, 901 F.2d at 391.[20]

 Defendants contend that the alleged conduct fails to rise to the level of a constitutional violation. This argument is

that the additional or substitute procedural requirement would entail.

17. In *Weller*, the Fourth Circuit held that post-deprivation procedures like those in *Fitzgerald* would suffice for decisions concerning visitation and placement, but not custody. *See* 901 F.2d at 394. Here, the removal did not involve a change of custody; as reflected in the J & D court's emergency removal and preliminary hearing orders, as well as the parties' consent order, the Department had legal custody of the children before January 13, 1989. The decision to remove them to foster care was therefore essentially a placement decision, not a custody change.

18. Plaintiffs cite *Franz v. United States*, 707 F.2d 582 (D.C.Cir.1983) for the constitutional dimensions of visitation rights. That case, however, is factually inapposite. It held only that a noncustodial father stated a cause of action sufficient to survive a motion to dismiss where he alleged that federal officials inducted his minor

children, along with their mother and a witness, into the Witness Protection Program without affording him any notice or opportunity to be heard, and in so doing totally and permanently severed his relationship with his children.

19. The words "substantive due process" appear only in the heading of Count I. The body of the count contains no specific allegations of substantive due process violations.

20. *See also Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980) (substantive due process "is concerned with violations of personal rights ... so severe ... so disproportionate to the need presented, and ... so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.") (citations omitted).

convincing. In *Weller*, the Fourth Circuit held squarely that "[i]t does not shock the conscience to hear that defendants removed a child in emergency action from the custody of a parent suspected of abusing him, based upon some evidence of child abuse." 901 F.2d at 391. "Substantive due process does not categorically bar the government from altering parental custody rights." *Id.* at 392. *Weller* is not precisely on point factually with the case at bar, but its reasoning is applicable. Given the facts, one's conscience is certainly not shocked by defendants' removal of the children from the Pfoltzer home. Especially significant in this regard are (i) the emergency and preliminary removal orders entered by the J & D court; (ii) the consent order; (iii) the fact that the Department already had legal custody of the children at the time of their removal; and (iv) the fact that the defendants had information that the Pfoltzers had violated the consent order. These, and other facts as well, leave no doubt that the removal of the children cannot be said to "shock the conscience." To the contrary, the record reflects that defendants exercised their best professional judgment in deciding to remove the children. *See Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (conduct of state actors to be examined in light of "accepted professional judgment," and the relevant decision, if made by a professional, is presumptively valid).

The same conclusion obtains with respect to defendants' imposition of the supervised visitation restriction; that action, even assuming it was a mistake, falls far short of shocking the conscience. *See Fitzgerald v.*

*Williamson*, 787 F.2d at 408 (fact that caseworkers responsible for allegedly abused child reduced parents' visitation rights and permitted child to remain with a foster parent who moved out of parents' geographical area does not shock the conscience). In sum, even taking plaintiffs' allegations as true, their claims do not rise to the level of substantive due process claims.

### 2) *Foster Care*

█ The Amended Complaint fails to make clear whether plaintiffs seek relief on the basis that defendants' alleged failure to protect the children while in foster care constitutes a substantive due process violation. Assuming, *arguendo*, that such a due process claim is intended, the Court is persuaded that it is foreclosed by *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). There, the Supreme Court held that Wisconsin's failure to protect an individual against private violence did not violate substantive due process rights, because a state has no duty to provide its citizens with adequate protection from private violence. The case involved a child who was brutally beaten by his father after being returned to his father's custody by a state agency. Similarly, in this case the transfer of the children's physical custody to foster parents did not make the Department "the permanent guarantor" of the children's safety. *See Weller*, 901 F.2d at 392 (quoting *DeShaney*, 109 S.Ct. at 1006).[21] Nor are foster parents state actors where, as here, the foster homes were not operated by the Department. *See Milburn v. Anne Arundel County Dept. of*

---

**21.** In *DeShaney*, the Supreme Court distinguished and reserved judgment with respect to situations where the state assumed control over the child:

> Had the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect.... We express no view on the validity of this analogy, however, as it is not before us in the present case.

109 S.Ct. at 1006 n. 9 (citations omitted). The case at bar does not fit within the situations

reserved in *DeShaney* for future consideration. First, it is not clear that the state removed the Morris children "by the affirmative exercise of its power." The Pfoltzers agreed in the consent order that the Department should maintain legal custody. Second, foster parents are not necessarily "state agents." Foster homes operated by private citizens are not comparable to state institutions that might more accurately be characterized by the terms "incarceration" and "institutionalization." Although there is some mention of a group home in which Randy and perhaps Theresa Morris were placed temporarily, the record discloses that no harm befell the children there.

*Soc. Serv.,* 871 F.2d 474 (4th Cir.) (harm suffered by child at hands of foster parents is not harm inflicted by state agents), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989).

C. First Amendment

Plaintiffs' First Amendment claim rests on the contention that while in foster care the children were not permitted to practice or receive instruction in Roman Catholicism, at least to the extent that Gloria Pfoltzer would have preferred. More particularly, the complaint alleges that the children were denied access to (i) their church, (ii) the religious guidance of their mother, (iii) the opportunity to attend Catholic Mass with their mother, (iv) religious instruction classes, (v) Catholic foster parents, and (vi) Catholic schools. Defendants respond (i) that plaintiffs fail to support their claim with sufficient facts and (ii) that under the circumstances of this case defendants need only have made reasonable efforts to accommodate the children's religious needs.

 It is beyond dispute that the right to the free exercise of religion is of signal constitutional importance and that parents exercise this right when they select religious experiences and opportunities for their children. *See Wisconsin v. Yoder,* 406 U.S. 205, 233–34, 92 S.Ct. 1526, 1542, 32 L.Ed.2d 15 (1972). Equally well-established is that this parental right is not absolute. *Id.; see also Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (state may require that children attend some school, public or private); *Duro v. District Attorney, Second Judicial District of North Carolina,* 712 F.2d 96 (4th Cir.1983) (state's demonstrated interest in compulsory education was of sufficient magnitude to override parents' religious interests).

 One limitation occurs where a parent refuses necessary medical care for his child on religious grounds. *See, e.g., Hermanson v. State,* 570 So.2d 322 (Fla.2d. DCA 1990) (parents may be punished for failure to provide children with medical attention); *Jehovah's Witnesses v. King*

*County Hospital,* 278 F.Supp. 488, 504 (W.D.Wash.1967) (three judge panel) (state may intervene in parents' religiously motivated decision refusing a blood transfusion for their child), *affirmed,* 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (per curiam). Parents rights are also not absolute where, as here, a parent voluntarily gives, or involuntarily loses, custody of a child to the state, which subsequently places the child in foster care. In such circumstances, as the Second Circuit has noted, the state cannot reasonably be expected to duplicate the standard of religious practice in the parents' home or satisfy the parents' every request with respect to the children's religious instruction. *See Wilder v. Bernstein,* 848 F.2d 1338 (1988). In that court's words,

> [i]t is one thing to recognize the right of parents to choose a religious school for their children as a private alternative to meeting state-imposed educational requirements in public schools. It is quite another matter, however, to suggest that parents who are unable to fulfill their parental obligations, thereby obliging the state to act in their stead, at their request or involuntarily, nonetheless retain a constitutional right to insist that their children receive state-sponsored parenting under the religious auspices preferred by the parents. So long as the state makes reasonable efforts to assure that the religious needs of the children are met during the interval in which the state assumes parental responsibilities, the free exercise rights of the parents and their children are adequately observed.

*Id.* at 1346–47. While a state should attempt to accommodate parents' religious preferences in selecting a foster care placement, such effort need only be reasonable. Thus, for example, a state has no duty to place a Buddhist child with a Buddhist foster family, a Quaker child with a Quaker family, or a Zoroastrian child with a Zoroastrian family, unless such a family is reasonably and immediately available.

 Furthermore, plaintiffs are not exempt from the normal procedural require-

ments of the Federal Rules of Civil Procedure. As the party opposing summary judgment, plaintiffs must come forward with probative evidence to support their allegation that the children were prohibited from practicing their religion. With respect to this latter requirement of proof, defendants' argument is convincing. Plaintiffs simply fail to substantiate their claims with any significant factual evidence. The sole reference to religion in plaintiffs' opposition to the motion for summary judgment is the following statement in the Pfoltzers' joint affidavit: "We repeatedly told [defendants] and others about the harm occurring to the children and that we wanted the children to exercise their Catholic faith. Our appeals were ignored." This does not establish as a matter of fact that the children were not permitted to practice their religion. Rule 56(e), Fed.R.Civ.P., provides that a party opposing summary judgment must by affidavit or other competent evidence set forth "specific facts showing that there is a genuine issue for trial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

■ In contrast to plaintiffs' lack of proof, defendants offer deposition excerpts from both Gloria Pfoltzer and the children. This testimony supports defendants' position that while the children might not have attended Catholic Mass or religious instruction classes with the frequency they might have had they been living with their mother, they were not restricted in their religious beliefs or practices. More particularly, Christopher Morris' deposition reflects that he attended church every Sunday with his foster parents, that the foster parents arranged for him to attend Catholic instruction classes, and that he made his First Communion while living in the foster home. Gloria Pfoltzer's deposition confirms that in her view Christopher's church attendance was regular. Randy Morris' deposition reflects that he attended church regu-

larly while living with the Ryans from approximately February 1989 to September 1989, and somewhat less regularly while living at Prospect Hill, a County or State group home. He did not attend Catholic instruction classes and expressed the view that in fact he never wanted or sought to do so. In her deposition, Gloria Pfoltzer confirmed that Randy attended church "probably three fourths of the time" while living with the Ryans and that after January 1, 1990, she was able to attend church with all the children during visitation periods. Gloria Pfoltzer's deposition and defendants' affidavits also suggest that Theresa Morris' foster family attempted to take her to church but was unable to do so, because Theresa engaged in disruptive temper tantrums.

The record in this case reflects that defendants made the type of reasonable effort suggested in *Wilder*. 848 F.2d at 1346–47. In addition to the deposition testimony just described, defendants submit affidavits stating that as a general matter the Department attempts to place a child with a foster family of the same religious background, although it is not always able to do so because of a chronic shortage of foster families. In this case some, but not all, of the children's foster parents were Roman Catholics. Moreover, all foster families receive a handbook and verbal instructions that provide that foster families should "encourage the child['s religious beliefs] and make religious activities accessible." Defendants Manzo, Hannigan, and Bird state their belief that the foster parents of the Pfoltzer children "made reasonable efforts to take the children to Catholic church or to make the opportunity available to them," but church attendance was not always possible. In sum, absent any evidence contrary to that of defendants, the Court is persuaded that plaintiffs' free exercise rights were adequately observed.

## D. Qualified Immunity

■ The qualified immunity doctrine requires summary judgment even if plaintiffs' constitutional rights were violated. This doctrine shields government officials

performing discretionary functions from civil damages liability provided their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The defense applies to officials sued in their personal capacities. *See Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985). Whether or not a constitutional violation has occurred, a defendant official should prevail if the right asserted by the plaintiff was not clearly established in the "particularized" sense that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). More specifically, immunity applies "even where the rights allegedly violated may be clear at some level of abstraction, ... if a reasonable officer could have believed his particular conduct lawful, a standard requiring a court to undertake an 'objective (albeit fact-specific)' inquiry into the legal reasonableness of the conduct." *Gooden v. Howard County, Maryland,* 917 F.2d 1355, 1361 (4th Cir.1990).

 On the facts presented here, defendants, as social workers, reasonably could have believed that because the Department already had "legal custody" of the children pursuant to orders of the J & D court and the parties' consent order, they had the right, after consultation with counsel,[22] to change the children's placement without an advance hearing and to permit only supervised visitation. Undoubtedly, plaintiffs have Fourteenth and First Amendment rights in the abstract; those rights, however, were not clearly established in the particularized circumstances presented here. *See, e.g., Fitzgerald v. Williamson,* 787 F.2d 403 (8th Cir.1986) (deciding in 1986 that post-deprivation procedures were sufficient to alleviate procedural due process concerns in the child visitation context and that restrictions on visitation do not violate substantive due process).[23] In *Van Emrik v. Chemung County Dept. of Social Services,* 911 F.2d 863, 866 (1990), the Second Circuit explained that child custody cases are particularly well suited to the policies underlying the doctrine of qualified immunity:

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

*Id.* The record here fits squarely within this framework; the information possessed by defendants, combined with the fact that the state already had legal custody, provid-

---

**22.** *See In re Scott County Master Docket,* 672 F.Supp. 1152, 1174 n. 6 (D.Minn.1987), *aff'd,* 868 F.2d 1017 (8th Cir.1989):

> To the extent that the social workers relied in good faith upon the advice of competent counsel on a question of law of sufficient complexity to justify resort to expert legal guidance the social workers are protected by principles of qualified immunity for conduct undertaken in reliance upon such advice, provided that the advice was not patently unreasonable under the circumstances of the case.

**23.** Plaintiffs' reliance on *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) with respect to their free exercise rights is misplaced; *Sherbert* is inapposite. There, the Supreme Court held that a state could not constitutionally apply eligibility provisions of an unemployment compensation statute to deny benefits to a claimant who had refused Saturday employment on religious grounds. In that event, the state directly penalized the exercise of religious belief by conditioning the receipt of a public benefit or privilege. This decision does not establish that plaintiffs' First Amendment rights were clearly defined or established in the foster care context or in any closely analogous situation.

ed a reasonable basis for defendants' decision to remove the children.

 Plaintiffs argue that their rights were well-established under state law. This is an overstatement. The statutory sections they cite concern the initial emergency and preliminary decisions to remove a child; they do not address either the situation of a removal following these determinations or a consent order that has placed legal custody in a government agency. *See* Va.Code § 16.1–251 (permitting Emergency Removal Order); § 16.1–252 (providing for Preliminary Removal Order). In any event, courts have recognized that violations of state law do not result in a forfeiture of immunity for the alleged violations of rights which have independent constitutional or other bases unless the rights which form the basis of plaintiffs' claims were conferred by state law. *See Myers v. Morris*, 810 F.2d 1437, 1469 (8th Cir.), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987)[24]; *see also Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) ("[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision").

## II. *Federal Statutory Claim*

Plaintiffs claim that defendants violated the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–628, 670–679(a) (the "AAA"), by failing to use reasonable efforts to prevent foster care and by not securing a judicial determination of reasonableness.[25]

 The AAA amended Title IV of the Social Security Act to provide the states with fiscal incentives to encourage more active and systematic monitoring of children in the foster care system. *See Vermont Dep't of Social and Rehab. Servs. v.*

*United States Dep't of Health and Human Servs.*, 798 F.2d 57, 59 (2d Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987). The Act conditions the receipt of federal funds on the implementation of a case review system for each child receiving foster care under the supervision of the state. The review system must incorporate certain features and comply with specified requirements. The legislative history reflects an intent to reduce foster care placements in favor of greater efforts to find permanent homes for children, either with their original families or adoptive ones. *See Artist M. v. Johnson*, 917 F.2d 980, 985 (7th Cir.1990) (explaining legislative history), *cert. granted*, — U.S. ——, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991).

 Plaintiffs first cite 42 U.S.C. § 671(a)(15), which provides in part that in order for a state to be eligible for payments, it must have an approved plan which:

> effective October 1, 1983, provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home

. . . . .

Plaintiffs also cite 42 U.S.C. § 672. Two portions of that statute are especially relevant:

> Each State with a plan approved under this part shall make foster care maintenance payments (as defined in section 675(4) of this title) under this part with respect to a child who would meet the requirements of section 606(a) of this title or of section 607 of this title but for his removal from the home of a relative (specified in section 606(a) of this title), if—

---

24. In *Myers,* the Eighth Circuit concluded that the depth and breadth of plaintiffs' liberty interest in familial relations is measurable only by resort to a balancing of private and state interests; therefore, that interest is not a clearly established right in the context of a reasonable suspicion that parents may be abusing children. *See* 810 F.2d at 1463.

25. It is unclear whether the Amended Complaint intends to plead an independent cause of action under the AAA itself or under the AAA as a federal statute enforceable under § 1983. Because the alleged statutory violation is not set forth in a separate heading or count, the Court construes the complaint as pleading the statute under § 1983.

1) the removal from the home occurred pursuant to a voluntary placement agreement entered into by the child's parent or legal guardian, or was the result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child and (effective October 1, 1983) that reasonable efforts of the type described in section 671(a)(15) of this title have been made;

42 U.S.C. § 672(a)(1).

No Federal payment may be made under this part with respect to amounts expended by any State as foster care maintenance payments under this section, in the case of any child who was removed from his or her home pursuant to a voluntary placement agreement as described in subsection (a) of this section and has remained in voluntary placement for a period in excess of 180 days, unless there has been a judicial determination by a court of competent jurisdiction (within the first 180 days of such placement) to the effect that such placement is in the best interests of the child.

42 U.S.C. § 672(e).

Defendants assert that the sequence of events and judicial determinations that occurred in this case were sufficient to satisfy the statute's substantive requirements. Assuming, without deciding, that the AAA is as a general matter applicable to this case,[26] the Court agrees with defendants with respect to 42 U.S.C. § 671(a)(15). First, the record reflects that defendants tried to avoid resorting to foster care. Defendants' affidavits state that after the emergency and preliminary removal decisions of the J & D court, the Department agreed in the consent order to return the children to the Pfoltzers in the expectation that the situation in the home would improve. The Department maintained this state of affairs for roughly five months, despite what it perceived as accumulating evidence of the Pfoltzers' non-compliance with the consent order. The affidavits further reflect that defendants considered continuing the children in the home or seeking Daniel Pfoltzer's removal from the home, but ultimately concluded that the children's safety required foster care placement. Plaintiffs offer only the allegations of the complaint in response.

Most persuasive to the Court, however, is the order issued by the J & D court following its March 16–18, 1989, hearing. The order states in pertinent part:

**26.** While the Court assumes, *arguendo*, that the AAA is indeed applicable, it maintains substantial doubt with respect to two questions. First, it is unclear whether the statute, which by its terms is designed to encourage *states* to adopt *plans* that meet certain federal requirements, creates a private cause of action against individual defendants sued in their personal capacities for individual actions where no allegation is made that defendants deviated from or failed properly to administer any plan. *Compare Scrivner v. Andrews*, 816 F.2d 261, 263 (6th Cir.1987) (holding that AAA created no right to "meaningful visitation" in § 1983 action by mother against social workers); *In re Cynthia A.*, 8 Conn.App. 656, 514 A.2d 360 (1986) (AAA is an appropriations act and does not apply to individual actions so as to support mother's claim that department of children and youth services failed to make reasonable efforts to reunite family) *with Artist M. v. Johnson*, 917 F.2d 980 (class action against state agency for violations of AAA); *L.J. ex rel. Darr v. Massinga*, 838 F.2d 118 (4th Cir.1988) (action against state and city officials, caseworkers and supervisors for maladministration of federally-funded foster care program), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989); *Native Village of Stevens v. Smith*, 770 F.2d 1486 (9th Cir.1985) (action by tribal village against state seeking federal funds), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185 (1986); *Lynch v. Dukakis*, 719 F.2d 504 (1st Cir.1983) (class action against state under AAA).

Second, it is unclear whether a cause of action under the AAA permits recovery of money damages. *Compare Guardians Assoc. v. Civil Service Comm'n*, 463 U.S. 582, 602 n. 23, 103 S.Ct. 3221, 3233, 77 L.Ed.2d 866 (1983) (opinion of White, J., joined by Rehnquist, J.) ("Damages indeed are usually available in a § 1983 action, but such is not the case when the plaintiff alleges only a deprivation of rights secured by a Spending Clause statute"); *Harpole v. Arkansas Dept. of Human Servs.*, 820 F.2d 923, 928 (8th Cir.1987) (stating in dicta that no action for monetary damages exists under AAA); *Lesher v. Lavrich*, 784 F.2d 193 (6th Cir.1986) (damages not available in § 1983 action alleging violation of AAA) *with L.J. ex rel. Darr v. Massinga*, 838 F.2d 118 (stating "the Supreme Court did not distinguish between prospective equitable relief and an action for money damages in regard to the right to enforce privately" in *Wright v. Roanoke Redev. and Housing Auth.*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)).

890

[T]he Department has established by clear and convincing evidence that Lisa, Randy, Theresa and Christopher Morris are children in need of services within the meaning of Va.Code § 16.1–279(C) (Supp.1988) in that the condition of the children resulted in a serious threat to the well-being and physical safety of the children, that the conduct complained of represents clear and substantial danger to the lives and health of the children, and that the children and parents are in need of services not being received and in fact declined by the parents; *that reasonable efforts have been made to prevent removal of Lisa, Randy, Theresa and Christopher Morris from their home; and that continued placement in the home would be contrary to the welfare of Lisa, Randy, Theresa and Christopher Morris;*

(emphasis added). At oral argument, plaintiffs' counsel contended that the hearing of March 16–18, 1989, considered only the Department's May or June 1988 petitions to have the children declared abused, neglected, or in need of services, and did not evaluate the propriety of the January 13, 1989, removal of the children and their subsequent foster care placement. This argument is unconvincing. Plaintiffs offer no evidence to support their claim. Nor is their view consistent with the language of the order, which refers to the "continued placement in the home." Reasonably construed, this language refers to the second half of 1988, when the children lived at home subject to the consent order. Accordingly, the Court is persuaded that defendants did not violate the standard incorporated in § 671(a)(15).

■ Plaintiffs ability to rely on § 672(a)(1) to state a cause of action is doubtful. This subsection requires states to make payments under certain conditions, but sets forth no substantive standards by which a court may measure the conduct of these defendants. In addition, the subsection requires payments only where the removal from the home occurred pursuant to either a "voluntary placement agreement" or was the result of a "judicial determination." Neither condition is applicable here. The parties to this case never entered into a "voluntary placement agreement" as that term is defined by the statute.[27] Nor did the removal of the children occur as a result of a judicial determination. The J & D court issued emergency and preliminary removal orders in 1988, but these were effectively superseded by the parties' consent order. The Department removed the children on January 13, 1989, with subsequent, but not prior, state court approval.

■ The same reasoning compels the conclusion that § 672(e) is inapplicable here. The children were not removed from the home "pursuant to a voluntary placement agreement." In any event, the condition set forth in this subsection was satisfied by the J & D court's March 1989 hearing and order. This hearing occurred within 180 days of the removal and was "to the effect that such placement is in the best interests of the child," 42 U.S.C. § 672(e), because the J & D court concluded that reasonable efforts were made to prevent removal and that continued placement in the home would be detrimental. For these reasons, summary judgment is warranted on plaintiffs' claim under the AAA.

III. *Liability for Alleged Abuse in Foster Care*

Plaintiffs contend that while in foster care Randy and Theresa Morris were

**27.** Subsection 672(f) defines the term "voluntary placement agreement" as "a written agreement ... between the State agency, any other agency acting on its behalf, and the parents or guardians of a minor child which specifies, at a minimum, the legal status of the child and the rights and obligations of the parents or guardians, the child, and the agency while the child is in placement." 42 U.S.C. § 672(f). The term "voluntary placement," in turn, is defined as "an out-of-home placement of a minor, by or with participation of a State agency, after the parents or guardians of the minor have requested the assistance of the agency and signed a voluntary placement agreement." *Id.* The only document in this case that bears even a remote resemblance to a "voluntary placement agreement" is the consent order, but the order did not provide for an "out-of-home placement." To the contrary, the consent order expressed the parties' intention to return the children to the Pfoltzer home.

abused by certain foster parents. The Amended Complaint cites three incidents of alleged abuse: (i) that Randy Morris was "thrown against a car" by a foster mother; (ii) that Theresa Morris was required to give a foster father "nude back rubs;" and (iii) that an unspecified incident of physical abuse occurred against Theresa Morris.[28] The complaint alleges that these incidents constitute a violation of the children's due process rights or of the AAA.

Whether the alleged incidents occurred as described in the complaint and whether they amounted to "abuse" are fiercely disputed. The Court need not resolve these disputes and, in fact, assumes for purposes of the instant motions that the incidents occurred as alleged, because the Court finds three of defendants' legal arguments dispositive. First, to the extent that plaintiffs intend to plead a substantive due process violation, the analysis in section I(B)(2) above is dispositive. In *Milburn v. Anne Arundel County Dept. of Soc. Serv.*, 871 F.2d 474 (1989), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989), the Fourth Circuit held that the Supreme Court's decision in *DeShaney* governed a § 1983 action in which Milburn sued a variety of defendants, including a county agency, social workers, and his former foster parents, as a result of alleged abuse by those parents. The facts that the alleged abuse in *Milburn* was attributed to foster parents rather than a natural parent as in *DeShaney* was deemed immaterial; in each case, "[t]he most that any of [the municipal defendants and their employees] might have been charged with was a failure to protect the plaintiff against private violence." 871 F.2d at 476.

■ Second, defendants argue that any alleged abuse was not done "under color of law" for purposes of § 1983, because foster parents are not state actors. This conclusion also follows from *Milburn*, which held that foster parents were not state

actors within the meaning of § 1983, because the facts did not show any intimate relationship between the foster parents and the state or any detailed guidance of the parents by the state. The facts that (i) the foster parents signed a contract with the state agency and (ii) the foster home was licensed or approved by the state were not sufficient to convert private parties into state actors.

> The State of Maryland was not responsible for the specific conduct of which the plaintiff complains, that is, the physical child abuse itself. It exercised no coercive power over the Tuckers; neither did it encourage them. The care of foster children is not traditionally the exclusive prerogative of the State.

*Id.* at 479. The Fourth Circuit took care to note that the determination of whether particular parties are state actors turns on the facts of each case. *See id.* at 476. Nevertheless, plaintiffs here offer no facts or arguments to distinguish this case from *Milburn*. At most, the record reflects that the foster homes in which the Morris children resided were in some way approved by Fairfax County and that the foster parents were provided with general guidelines. As in *Milburn*, it is nowhere alleged that the foster parents received any compensation for their services or that they received any detailed instructions or intimate supervision. Accordingly, the Court finds no persuasive reason to conclude that the foster parents were state actors.

■ Third, defendants argue that there is no evidence that they were "deliberately indifferent" to any alleged abuse. This argument perhaps is more accurately phrased as a contention that defendants did not intentionally cause or contribute to the abuse. Due process affords protection only against deliberate acts of government agents. In *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986), the Supreme Court held that "the

---

**28.** At oral argument, plaintiffs' counsel stated that this unspecified allegation referred to an incident in which Theresa Morris was scratched or scraped while being carried down a flight of stairs. The record contains no facts of any kind with respect to this incident, nor with respect to

the allegation in the complaint that while resident in a group home Randy Morris was "exposed to Satanism and his religious values were eroded." Accordingly, the Court is unable to evaluate these incidents.

Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *See also Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("deliberate indifference" in Eighth Amendment prison context); *Doe v. New York City Dept. of Soc. Serv.,* 649 F.2d 134 (2d Cir.1981) (applying deliberate indifference as relevant mental state in § 1983 action by foster child against placement agency as a result of abuse by foster parent), *cert. denied sub nom. Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *B.H. v. Johnson,* 715 F.Supp. 1387, 1396 (N.D.Ill.1989) (holding that child has § 1983 cause of action against state for injuries suffered while in foster care where state is deliberately indifferent to likelihood that foster home is unsafe).

■ Plaintiffs present no persuasive evidence that defendants knew of any propensity for abuse by the foster parents or intentionally or even recklessly failed to take action upon receiving Gloria Pfoltzer's complaints. To the contrary, the record reflects (i) that the County approved each foster family subject to criminal and other background checks; (ii) that the Gustavesons (re Theresa Morris) and the Ryans (re Randy Morris) have had no complaints made against them aside from Gloria Pfoltzer's; (iii) that the Department investigated Gloria Pfoltzer's allegations of abuse and determined them to be unfounded; and (iv) that Theresa Morris was removed from the Gustaveson home and Randy Morris from the Ryan home very shortly after the alleged incidents. Plaintiffs' conclusory statements that the children were suffering emotional abuse, that plaintiffs conveyed their concerns to defendants, and that "[o]ur appeals were ignored" are insufficient to withstand summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

■ Neither the complaint nor plaintiffs' memoranda make clear whether plaintiffs intend to claim that any alleged abuse suffered by the children constitutes a violation of the AAA by these defendants. If so, plaintiffs point to no section of the statute that might confer a private right of action. The Court's review discloses only one relevant section, 42 U.S.C. § 671(a)(9), which establishes that in order for a state to be eligible for federal payments, its approved plan must provide that the state foster care or adoption assistance agency will

(A) report to an appropriate agency or official, known or suspected instances of physical or mental injury, sexual abuse or exploitation, or negligent treatment or maltreatment of a child receiving aid under part B of this subchapter or this part under circumstances which indicate that the child's health or welfare is threatened thereby; ...

42 U.S.C. § 671(a)(9). The record in this case does not support a claim that defendants violated this subsection. As explained above, defendants' affidavits show that the Department investigated each of Gloria Pfoltzer's complaints of abuse and concluded that each was either unfounded or did not rise to the level of a threat to the child's health or welfare. In any event, plaintiffs nowhere contend that any of the alleged incidents amounted to criminal conduct and offer no evidence to suggest that defendants failed to conduct a proper investigation.

## *Conclusion*

The Court concludes that while the circumstances faced by plaintiffs were undeniably difficult, and for the children tragic, they have failed to establish any First or Fourteenth Amendment violation for purposes of § 1983. In the alternative, summary judgment is appropriate for the individual defendants on the ground of qualified immunity. Plaintiffs similarly fail to establish a violation of the AAA, the applicability of which is at best doubtful. Furthermore, defendants cannot be liable for alleged abuse that occurred during foster care. Defendants' motion for summary judgment must be granted, and plaintiffs' motion for partial summary judgment must be denied.

An appropriate order shall issue.