**Dennis Lee CAMPBELL, Plaintiff,**

**v.**

**Paul BURT, et al., Defendants.**

**Civil No. 95–00137 ACK (FIY).**

United States District Court,
D. Hawai'i.

June 14, 1996.

Dennis Lee Campbell, Pearl City, HI, Pro Se.

Susan Barr and Colleen L. Chun, Office of the Attorney General–State of Hawaii, Honolulu, HI, for Defendant.

### DECISION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAY, Chief Judge.

### DECISION

This matter came before the Court for trial on May 15, 1996. In this suit Plaintiff Dennis Lee Campbell ("Plaintiff") seeks civil damages against Defendant Paul Burt ("Defendant"), formerly a social worker with the State of Hawaii, for Defendant's act of taking emergency physical custody over Plaintiff's children without a prior court order to protect them from potential abuse and/or neglect.

Having considered the testimony and other evidence presented, the Court finds that Defendant violated the constitutional procedural due process rights of Plaintiff when he waited seven days to file a court petition for temporary custody of the children after he took emergency physical custody of them without a prior court order. However, the Court finds that Plaintiff may not receive damages because Defendant is entitled to qualified immunity. In addition Plaintiff has no remedy for Defendant's initial act of taking the children into custody because in a previous order this Court granted partial summary judgement on this issue in favor of Defendant, given that Defendant was protected by qualified immunity for that action. Likewise, there is no liability for custody of the children following the family court hearing because such custody was authorized by court order.

This Court's findings are more fully set forth in the accompanying findings of fact and conclusions of law.

### FINDINGS OF FACT

*Background Information*

1. Both parties have stipulated to the admission of all exhibits into evidence, which have been designated as Plaintiff's exhibit 1 and Defendant's exhibits 11 through 28.

2. Plaintiff brought this suit against Paul Burt and "three unnamed police officers," though Plaintiff has not specified who these police officers are. The case is solely against Burt because no other party has been properly brought in.

3. Plaintiff is the father of Miles Campbell and Travis Campbell, as established by the Judgement of Paternity by the Family Court of the Third Circuit, State of Hawaii ("Family Court").

4. At paternity proceedings for ·Colin James Campbell, the Family Court determined on March 21, 1996 that Plaintiff contested paternity and requested genetic testing to establish paternity for Colin. However at trial Plaintiff argued that Colin is his son and that he does not contest paternity of the child.

5. Plaintiff's complaint only alleges that his sons Miles and Travis were illegally taken into custody. No mention of Colin Campbell was made in the complaint and the complaint has not been amended to allege a deprivation in respect to Colin.

6. Theresa Rossi is the natural mother of Miles, Travis, and Colin and she has sole legal custody of them.

7. At the time of the alleged deprivation of Plaintiff's rights, Plaintiff had reasonable visitation rights to Miles and Travis, as established by the paternity judgments entered by the Family Court on July 28, 1989 and January 8, 1988, respectively. However the Family Court did not set forth a visitation schedule or in any way limit Plaintiff's visitation with his children.

8. At various times Plaintiff has lived with Miles, Travis, and Colin, along with their mother Theresa Rossi, although at trial Plaintiff disputed that he was living with the children at the time Defendant took physical custody over them.

*Facts Leading To Defendant Taking the Children Into Custody*

9. On or about November 16, 1992, Plaintiff had been living with Theresa Rossi and her three children, Miles, Travis, and Colin, respectively ages 10, 6, and 2 at the time. Plaintiff arrived at the home drunk and got into an argument with Rossi. Plaintiff punched her and threw a table at his son Miles, which struck Miles on the leg. Plaintiff then poured gasoline on Rossi and on the floors of the home while the children were in the house. For some unknown reason the gasoline ignited, possibly due to a pilot light as speculated by the Fire Department. The house then burned to the ground, though Plaintiff and Theresa Rossi rescued the children to safety without harm from the fire.

10. For his actions surrounding this November 1992 incident Plaintiff was arrested for criminal property damage in the first degree and abuse of a family member. Plaintiff remained jailed until April 21, 1993, at which time he was released pending trial.

11. On November 10, 1993 a jury convicted Plaintiff on these offenses and on February 2, 1994 Plaintiff was sentenced to a total of 10 years imprisonment. (Defendant's Exhibits 21 and 22.) On appeal the Supreme Court of the State of Hawaii affirmed Defendant's conviction and Defendant is currently serving this sentence.

12. Between December 1992 and April 1993 the children resided with Theresa Rossi in a homeless shelter.

13. During this period the Child Protective Service ("CPS") received a mandatory report of physical neglect of Travis from his school. He was observed to be dirty and smelly, and had cuts that had not been attended to. At trial Plaintiff conceded that the children were dirty and smelled when they visited him at jail during this time.

14. Also during this time, on January 11, 1993, Theresa Rossi was arrested for Driving Under the Influence ("DUI"). This was her second DUI arrest in two months with the children in the car. The state convicted her and revoked her driver's license.

15. On or about April 1993, Theresa Rossi and the children moved back to her property on which the house had burned. The house had not been rebuilt and the family lived in a storage shed measuring approximately 6′ × 12.′ The shed had a concrete floor and had no running water, hot water, refrigerator, toilet, or cooking facilities. At trial Plaintiff argued that the family had access to a toilet and used a cooler for refrigeration, although without much success.

16. On or about April 21, 1993, Plaintiff was released from jail pending his criminal prosecution and thereafter returned to Theresa Rossi's property to live with her and the kids in the shed. It appears that all five of them resided in the storage shed.

17. In April of 1993 Defendant was a social worker with the State of Hawaii Department of Human Services ("DHS"), where

he began in January of 1993. At that time Defendant had received his Master's degree in psychology from Washington State University and had received training in human services. After joining DHS Defendant went through extensive training and thereafter began receiving cases in April of 1993. At that time Defendant was assigned to the case involving Plaintiff's three children.

18. When Defendant was assigned to the case involving Miles, Travis, and Colin Campbell, Defendant had never before taken emergency custody over anyone's children. However at trial Defendant testified that he felt that emergency custody might be appropriate in this case because of the following facts: (1) the mother had two DUI arrests while the children were in the car, (2) incidents of physical neglect of one of the children had been confirmed, (3) Plaintiff had been charged with physical abuse of a family member, including abuse to one of the children, stemming from the November 1992 incident, (4) in this incident Plaintiff had doused the children's mother and the house with gasoline, which ignited and burned down the house where the children had been living, (5) Plaintiff had a firearms conviction in his record, and (6) it had been reported that the children were living on the property in a 6' × 12' shed which lacked running water and electricity. Defendant testified that his greatest concern was a report that Plaintiff had gotten out of jail on April 21, 1993 and was living in the shed with Theresa Rossi and the three children.

19. Given these facts Defendant consulted with his acting supervisor, Elsie Kamahele, who instructed him that it would be appropriate to take emergency custody of the children if Defendant could confirm that Plaintiff had resumed living with the children.

20. Kamahele also told Defendant that it would be appropriate to take the police with him when Defendant went to the property, given Plaintiff's past firearms violation. Defendant testified that Kamahele arranged for the police to meet him.

21. On Tuesday, April 27, 1993 Defendant went to Theresa Rossi's property where Plaintiff was reportedly living with the three children. Defendant was accompanied by the police and by a lower-level DHS aide named Kalani Motta.

22. Plaintiff testified that the police cars screeched to a halt in front of the property, one of the police officers cocked a shotgun at him and the other officers drew their pistols. However Defendant testified that he never saw the police officers remove their guns from their holsters, although the police officers went onto the property before him to confirm the whereabouts of Plaintiff and Rossi. The Court finds that the fact that the officers might have drawn their weapons would not have constituted unreasonable force, given Plaintiff's previous firearms violation and his volatile conduct a few months earlier when he doused the family home with gasoline and may have ignited the gas (although it was never established how the fire started).

23. Defendant testified that while he was on the property he confirmed that Plaintiff was out on bail and was living there with the three children and their mother. According to Defendant, Plaintiff told him that he had been living with them on the property but was willing to leave in order to avert Defendant from taking custody of the children. At trial Plaintiff suggested that he was not living with the family but was merely visiting the children. However the Court finds Defendant's testimony to be more credible. Also, Plaintiff's assertion at trial that he did not live on the property directly conflicts with his Complaint, admitted as Plaintiff's Exhibit 1, which states that the property was his "place of residence" at the time Defendant took the children. In addition Plaintiff stated in his final argument that he took baths on the property. For these reasons the Court finds that Plaintiff had been living on the property at the time.

24. Even if Plaintiff had not been living on the property at that time the Court concludes that the children were nevertheless in imminent danger, given that the property was still covered with dangerous debris from the fire and, further, that the children were in Plaintiff's care.

25. When Defendant visited the property on April 27, 1993, Theresa Rossi and Colin were not there. Miles and Travis, ages 10 and 6 at the time, were on the property alone with Plaintiff.

26. Upon confirming that Plaintiff had returned to the property to live with the three children, and confirming that the family had been living in the storage shed on the property, Defendant determined that the children did not have a safe family home and that the children were likely to suffer imminent harm if DHS did not take emergency physical custody over them.

27. Defendant instructed the police to take protective custody of the children. At approximately 4:45 p.m. the police took custody over Miles and Travis at the property and thereafter took custody of Colin at a neighbor's house where he had been visiting at the time.

28. The police released the children into Defendant's custody at approximately 6:00 p.m. that same day.

*Events After Defendant Assumed Physical Custody*

29. Under H.R.S. § 587–24 and § 587–21, DHS was required to file a petition for temporary custody within two working days of taking emergency physical custody over a child without a prior court order.

30. Defendant received physical custody of the children at 6:00 p.m. on Tuesday, April 27, 1993.

31. On Thursday, April 29, 1993 Defendant began working on the petition for temporary custody of the children, believing the petition was due on Friday, April 30, 1993. Defendant prepared the petition with a State of Hawaii Deputy Attorney General and completed the petition that same day.

32. When Defendant finished the petition he did not file it himself because he thought that a supervisor or a DHS aide would file it with the Family Court. The petition needed to be approved by one of the supervisors. Defendant turned the petition in to one of his supervisors, either Ms. Kamahele or Ms. Wilcox, with a note on it, although neither supervisor was available to sign the petition on time.

33. Fearing that the petition would not be filed within the two-day deadline, Defendant consulted with the DHS Director of East Hawaii, Royden Watanabe.

34. Watanabe first instructed Defendant to attempt to get a voluntary agreement from Theresa Rossi for DHS to assume temporary foster care, which Defendant attempted to no avail.

35. Defendant testified that when that failed Watanabe called Deputy Attorney General Gary Murai, who suggested having the police "re-arrest" the children in order to trigger a new two-day deadline within which to file the court petition. On this advice the children were "rearrested" on Friday, April 30, 1996.

36. The court petition was not filed until Tuesday, May 4, 1993, a full week after Defendant initially took custody over the children and five days after the initial two-day deadline had elapsed.

37. Defendant testified that he thought the petition had been filed on time because May 4 was "two working days" after the children were "rearrested" on Friday, April 30.

38. However, the Court finds that the "rearrest" did not extend the deadline for filing under Hawaii law. Defendant and DHS thus exceeded the period allotted for filing the petition under § 587–24 by approximately five days.

39. On May 4, 1996 the Family Court issued an Ex Parte Order For Temporary Foster Custody, granting DHS continued custody over the children. The Family Court found that the children's continued placement in emergency foster care was necessary to protect them from imminent harm. (Defendant's Exhibit 19.)

40. Plaintiff claims that he had no idea where Defendant took his children and that DHS did not give him notice of where they were. However at trial Defendant testified that at the time he removed the children he spoke to Plaintiff about arranging visitation as soon as possible. Defendant further testi-

**1466**

fied that he believed that he made supervised visits available to Plaintiff prior to the court hearing. However the Court finds that the evidence does not establish whether Plaintiff visited his children during the five days in which Defendant failed to timely file the court petition for custody.

41. Any finding of fact which may be deemed, in whole or in part, more properly a conclusion of law shall be deemed as such. All findings by the Court are based upon a preponderance of the evidence.

### CONCLUSIONS OF LAW

*Substantive Due Process and Fourth Amendment Claims*

1. Although Plaintiff's complaint does not clearly identify specific causes of actions, to the extent that Plaintiff asserts that Defendant violated his constitutional rights of substantive due process or the Fourth Amendment, the Court finds that these claims are barred by the doctrine of qualified immunity. In a prior order on Defendant's appeal of the Magistrate Judge's Findings and Recommendation on his motion for summary judgement, this Court ruled that Defendant was entitled to qualified immunity for his initial act of removing the children without a prior court order. (*See* Order Modifying and Adopting Magistrate's Findings and Recommendation, Filed March 12, 1996, Granting In Part and Denying In Part Defendant's Motion for Summary Judgement.)

2. In particular, the Court did not upset, and therefore adopted, that portion of the Magistrate's Findings and Recommendation which found that Defendant's act of taking temporary emergency custody over the children was justified because a reasonable social worker would have believed that the children were in danger of imminent harm.

*Procedural Due Process Claim*

A. *Liberty Interest*

■ 3. It is well established parents have a liberty interest in the custody of their

children.[1] For example the Second Circuit has stated that "it was clearly established that a parent's interest in the custody of his or her children was a constitutionally protected interest of which he or she could not be deprived of without due process ..." *Robison v. Via,* 821 F.2d 913, 921 (2nd Cir.1987) (cited in *Baker v. Racansky,* 887 F.2d 183, 188 (9th Cir.1989)).

■ 4. This parental interest is one of the most fundamental constitutional interests. "There are few rights more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate." *Jordan v. Jackson,* 15 F.3d 333, 342 (4th Cir.1994). Indeed, "[i]t is clear that the private, fundamental liberty interest involved in retaining the custody of one's child and the integrity of one's family is of the greatest importance." *Weller v. Dept. of Soc. Serv. For Baltimore,* 901 F.2d 387, 394 (4th Cir.1990). *See also Duchesne v. Sugarman,* 566 F.2d 817, 826 (2nd Cir.1977) (parents have a protected liberty interest in custody of their children).

■ 5. The Court rejects Defendant's assertion that Plaintiff does not have a constitutionally-protected liberty interest because the state paternity judgments gave him mere visitation rights to his children rather than joint custody. Just as a state statute cannot establish the basis for a constitutional claim under § 1983, *Weller* at 392, state law which gives Plaintiff mere "visitation rights" does not undermine the importance of his parental rights under the federal constitution.

6. Although Plaintiff was at a minimum entitled to visitation with his children, the visitation provision in the judgement of paternity did not restrict when or how often he could see his children. Indeed, the Court finds above that Plaintiff was living with his children at the time Defendants took custody over them.

---

[1]. Though some courts have held that where there is reasonable suspicion that the parent is abusing his children, the parental liberty interest "in keeping the family unit intact" is not a clearly established right. *See Myers v. Morris,* 810 F.2d

1437 (8th Cir.), cert. denied, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). However this "clearly established" analysis is relevant to qualified immunity, not to whether or not there is a constitutional liberty interest.

7. For these reasons Plaintiff had a liberty interest in family unity even though he was only entitled to "visitation rights" under Hawaii law.

B. *What Process Is Due*

■ 8. The only procedural due process issue before the Court is what rights Plaintiff had under the constitution to post-deprivation judicial review of Defendant's act of taking temporary emergency custody of his children.[2]

■ 9. Though at trial Defendant conceded that he violated state law under H.R.S. § 587 by failing to file a court petition for custody within two days of taking physical custody of the children, the violation of this state statute does not in itself establish that Defendant violated Plaintiff's rights under the federal constitution. *See van Emrik v. Chemung*, 911 F.2d 863 (2nd Cir.1990); *Doe v. Connecticut*, 911 F.2d 868, 869 ("A violation of state law neither gives [plaintiffs] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.").

■ 10. In emergency situations where there is suspected child abuse, state social workers may remove the children from the parent's custody without a prior court order. As stated by the Second Circuit, while parents have a protected liberty interest in custody of their children, it "remains[ ] equally well established that officials may temporarily deprive a parent of custody in 'emergency' circumstances 'without parental consent or a *prior* court order.'" *Robison*, 821 F.2d at 921 (quoting *Duchesne*, 566 F.2d at 826).

11. Parents who are not entitled to prior judicial review nevertheless have due process rights; their parental due process rights are merely postponed, not nullified. *Jordan*, 15 F.3d at 342; *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983).

12. Such parents are entitled to prompt post-deprivation judicial review. *Id.* It is "well settled that the requirements of process may be delayed where emergency action is necessary to avert imminent harm to a child, *provided that adequate post-deprivation process to ratify the emergency action is promptly accorded.*" *Jordan*, 15 F.3d at 342 (emphasis added). *See also Lossman*, 707 F.2d at 291 (prompt post-deprivation hearing extinguishes any failure by the state to hold a predeprivation hearing); *Weller*, 901 F.2d at 396 (contemplating that such a right exists); *Caldwell v. LeFaver*, 928 F.2d 331, 333–34 (9th Cir.1994) (not reaching this issue but discussing case decisions which suggest this right exists); *Morrison v. Jones*, 607 F.2d 1269, 1276 (9th Cir.1979) (finding that dismissal of procedural due process claim not proper at preliminary stage, where mother alleged that state sent her child out of the country without affording her a post-deprivation hearing).

13. In defining what review is "prompt" under the due process clause, the Court adopts the reasoning in *Jordan v. Jackson*, 15 F.3d 333. In *Jordan*, the only court to attempt to establish the limits of what delays are permissible under the "prompt" standard,[3] the Fourth Circuit stated that a delay of 72 hours borders on the outer limits of constitutionality: "this period is near, if not at, the outer limit of permissible delay between a child's removal from his home and judicial review." *Id.* Though the court held that a 65– to 72–hour delay in holding a post-deprivation hearing did not violate the procedural due process rights of parents whose children were removed from their custody because the children were in imminent danger, the court explained the mitigating factors why this delay was permissible under the facts of that case. First, the state had taken custody immediately before a weekend

2. The Court does not consider whether Defendant's initial act of removing Plaintiff's children without a prior court order violated Plaintiff's due process rights, because the Court's prior order already found that Defendant is entitled to qualified immunity on that issue. *See supra.*

3. Courts prior to *Jordan* merely held that untimely review—or the complete denial of post-deprivation judicial review—violate procedural due

process. *See Weller* at 396 (finding that plaintiff stated a procedural due process claim where state completely denied father of a post-deprivation hearing); *Duchesne v. Sugarman*, 566 F.2d at 826 (36–month delay in state judicially ratifying their custody of children of mother who was housed in a psychiatric ward; ratification process initiated by mother, not state).

**1468**

and the delay was justified because judicial officers were not available on weekends for hearings. *Id.* at 351. Second, the state statute provided that hearings be held "as soon as possible" before or after the removal of the children from a parent's custody; the court found that in the vast majority of situations parents would be afforded the "certainty of almost immediate review." *Id.* at 347.

■ 14. Under the Supreme Court's standard for assessing whether a post-deprivation delay comports with procedural due process, the Court must weigh the importance of the parental rights at stake. In *FDIC v. Mallen* the Supreme Court articulated this rule:

> In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.

486 U.S. 230, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988) (quoted in *Jordan* at 345).

■ 15. Given the grave importance of the parental rights at stake when the state takes temporary physical custody over children, the post-deprivation hearing must truly be "prompt" in the strictest sense because the parental liberty interest in custody over their children is so fundamental. *Id.* at 345. Delays in post-deprivation hearings must be minimal and the hearing must be held promptly after the state takes physical custody over the plaintiff's children.

16. In the case at bar, the one-week delay by Defendant and DHS in obtaining a post-deprivation hearing to ratify their emergency temporary custody of Plaintiff's children violated Plaintiff's procedural due process rights.

17. Though the Ninth Circuit in *Baker v. Racansky* suggested that a hearing held five days after the state takes custody of a child would not violate the procedural due process rights of the parents, the Court finds that case is not controlling. *See* 887 F.2d 183, 190

(9th Cir.1989) (hearing held on 9/16 after child taken into custody on 9/11 did not violate clearly established constitutional law for purposes of qualified immunity). *Baker* addressed only a parent's right to a predeprivation hearing and did not squarely address procedural due process rights to a *post*-deprivation hearing. Moreover the holding in *Baker* is limited to the qualified immunity inquiry; the court merely found that the social workers did not violate "clearly established law" when they took emergency custody of the plaintiff's child and did not hold a hearing until five days later. The fact that it is not "clearly established" for purposes of qualified immunity that a five-day delay does not violate the constitution does not in itself show that a five-day delay is permissible.

18. Moreover the Court finds that there were two competing interests at stake when Defendant Paul Burt took Miles and Travis Campbell away from Plaintiff. These two interests were the right of a parent to the care and custody of his children, which is not absolute; and, the right of the children to be safe and secure from physical abuse and neglect. The constitutional principle at stake for Plaintiff is sufficiently vindicated if he is placed in no worse a position than if the petition had been filed timely. *See Mt. Healthy City Board of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1976). In this case, the Judge of the Family Court would have granted temporary foster care to DHS even if the petition would have been filed earlier and Plaintiff is not worse off because the petition was filed five days late.

*Qualified Immunity For Defendant's Failure to File a Timely Petition*

■ 19. An official is entitled to qualified immunity if the right which he allegedly violated is not "clearly established." *Anderson v. Creighton*, 483 U.S. 635, 639–41, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "Qualified immunity shields only that conduct not violative of clearly established rights of which a reasonable person would have known." *Austin v. Borel*, 830 F.2d 1356, 1363 (5th Cir.1987).

20. Defendant is entitled to qualified immunity because it was not clearly established law at the time that it would violate Plaintiff's procedural due process rights to wait seven days to petition the family court for an order ratifying his emergency custody over the children.

21. Although it may have been clearly established that parents are entitled to prompt post-deprivation hearings, it was not clearly established that a seven-day delay in the hearing would violate Plaintiff's due process rights. At the time Defendant took custody of Plaintiff's children in April of 1993 there were no cases which established defined what is a "prompt" post-deprivation hearing for purposes of procedural due process. Notably, the only case which has attempted to set forth the outer limits of what delays in post-deprivation hearings are constitutionally permissible, *Jordan v. Jackson*, was decided in January of 1994—*after* Defendant took custody of the children in April of 1993.

22. In addition it was also not clearly established whether taking emergency custody would violate the constitutional rights of a parent such as Plaintiff who had mere visitation rights rather than full legal custody of his children.

23. For these reasons a reasonable social worker would not have known that this delay would have violated Plaintiff's due process rights. Moreover Defendant made reasonable good faith efforts to file the petition in compliance with the statute.

24. Thus Defendant is not liable to Plaintiff for any damages even though Defendant violated Plaintiff's procedural due process rights when he delayed in filing the court petition for temporary custody over Plaintiff's children.

25. Even though Defendant violated state law by not filing the petition within the two-day period required by the statute, whether or not Defendant Burt violated a state statute is not relevant on the question of what law is clearly established for purposes of qualified immunity. A violation of state law by child protective service workers is not sufficient to establish a § 1983 claim or deprive a defendant of qualified immunity. *See Doe*, 911 F.2d 868.

*Other Potential Claims*

26. The Court finds, and Defendant concedes, that the five-day delay in filing the court petition for temporary custody violated state law under H.R.S. § 587. However Plaintiff is not entitled to any relief, assuming relief would be otherwise available to him, because Plaintiff has not asserted any state tort claims.

27. Plaintiff also has no cognizable claim for negligent supervision and training, an issue he raised only in closing arguments at trial. Plaintiff has showed no facts to establish this, other than this was Defendant's first case in which he took protective custody over children. It is apparent from Defendant's testimony that he received extensive training upon starting as a social worker in January 1993 before he started handling any cases. In addition the Court finds that he consulted and was amply instructed by his supervisors on how to proceed in handling this case involving protective custody over Plaintiff's children. Last, any such claim by Plaintiff is barred by the Court's prior finding that he is entitled to qualified immunity for his initial act of taking the children into custody.

28. Any conclusion of law which may be deemed, in whole or in part, more properly a finding of fact shall be deemed as such. All findings by the Court are based upon a preponderance of the evidence.

IT IS SO ORDERED.