707 So.2d 1250 (1997)
James Edward READY, et al., PlaintiffsAppellees,
v.
STATE of Louisiana, DEPARTMENT OF HEALTH AND HUMAN RESOURCES, DefendantAppellant.
No. 95-1564.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1997.
Opinion on Rehearing March 25, 1998.
*1252 Virgil Russell Purvis, Jr., Jonesville, for James Edward Ready, et ux., indiv., etc.
Robert Elton Arceneaux, Mack E. Barham, New Orleans, Virgil Russell Purvis, Jr., Jonesville, Travis L. Bourgeois, for James Edward Ready, et ux., indiv., etc. on rehearing.
Andrew Parker Texada, Mark D. Pearce, Alexandria, for State, Through DHHR.
Before YELVERTON, KNOLL,[1] COOKS, SAUNDERS and DECUIR, JJ.
KNOLL, Judge.
In this tort action for damages, the trial court held the State of Louisiana, Through the Department of Health and Human Resources (DHHR) liable to James Ready and Linda Wilson (hereafter the Readys) for damages resulting from its wrongful removal of their son, James Cody (Cody), from their custody on March 28, 1988.[2] After a hearing on March 28, 1988, the juvenile court found that Cody (DOB December 8, 1987) was a child in need of supervision and in need of care. In accordance with that finding, the juvenile court removed Cody from the custody of his parents and awarded custody to his paternal aunt, Linda Dennis. In particular, the order read, in pertinent part:
It is further ordered that the care, custody, and control of the minor child, James Cody Ready, be and the same is hereby awarded to Linda Dennis; and it is ordered that the Office of Health and Human Resources, Office of Human Development, Catahoula Office, be granted the supervision of the home of Linda Dennis for a period of six (6) months from the date of this judgment.
Although the award of custody was for a limited six month period, Cody remained in the physical custody of his aunt, Linda Dennis, until 1992.
Ultimately, in April of 1993, the Readys filed this damage action against DHHR, alleging that they were deprived of Cody's custody without due process. After a trial on the merits, the trial court held that DHHR deprived the Readys of their custody of Cody from March 28, 1988, to March of 1993, without due process. The trial court awarded Cody and the Readys compensatory damages under Louisiana tort law and punitive damages under the provisions of 42 USC § 1983. Accordingly, it awarded Cody $350,000 as compensatory damages and $150,000 for punitive damages. It further awarded $175,000 each to James and Linda Ready[3] as compensatory damages and punitive damages of $50,000 each. The trial court further awarded $25,000 to Cody's younger sister, Kimberly, for the loss of companionship of her brother and for the sexual assault Cody perpetrated against her as a direct result of his alleged exposure to deviant sexual acts while he was in the custody of his aunt, Linda Dennis.
DHHR appeals contending that the trial court erred: (1) in failing to dismiss the Readys' claims on a peremptory exception of prescription; (2) in awarding damages against DHHR for the denial of the Readys' rights to due process at the March 28, 1988 hearing; (3) in holding DHHR liable for damages for its failure to change Cody's custody after the March 28, 1988, hearing; (4) in awarding compensatory and punitive damages against DHHR pursuant to 42 USC § *1253 1983; (5) in awarding Kimberly $25,000 for Cody's alleged acts; (6) in refusing to admit the transcript of the March 28, 1988, hearing into evidence; (7) in awarding damages to the Readys after they acquiesced in granting Cody's custody to Linda Dennis; (8) in finding that DHHR modified the visitation rights granted the Readys without court approval; (9) in awarding Lejeune damages for mental anguish; and, (10) in awarding excessive damages. We reverse and render.[4]

FACTS
The trial court provided written reasons for judgment which set forth the facts of this case and which we adopt as our own:
In October of 1987, the State of Louisiana through the Department of Health and Human Resources ... instituted juvenile proceedings concerning Belinda Renee Wilson (Renee) and Angela Gail Wilson (Gail) in Catahoula Parish. Renee is the child of James Ready (James) and Linda Wilson Ready (Linda). Gail is the child of Linda Wilson Ready and Carlton Stockman. James and Linda Ready have two other children, James Cody Ready (Cody) and Kimberly Ready (Kimberly). Cody was born on December 8, 1987, and Kimberly was born on October 29, 1988. On March 28, 1988, the custody of Gail and Renee was taken from the Readys and granted to the State of Louisiana and the custody of Cody was granted to James Ready's sister, Linda Dennis (Dennis).
* * * * * *
James and Linda Ready attended high school together in Sicily Island, Louisiana. They began dating and Linda became pregnant with James' child. The couple did not marry at that time and Renee was born out of wedlock. James and Linda drifted apart and went their own ways. James married and had several other children. Linda had a second child, Gail, out of wedlock by another man. Linda married Adell Cox, who was divorced, and then Herman White, whom she divorced. After her divorce from Herman White, Linda moved back to the Sicily Island area and began to see James again. Sometime in 1987 James and Linda began living together near Sicily Island. By this time, Renee was 14 years of age, and Gail was 12 years of age. It is apparent that Renee harbored ill feelings toward her father [James], with whom she had very little contact up until this time. Linda acknowledged that she had difficulty disciplining the two girls, and up until the time that she began to live with James, they had done pretty much as they pleased.
In the middle of 1987, Renee and James had several confrontations. Renee ... secretly began to see a 21 year old divorced man. When James discovered this, he spanked Renee and began to increasingly place her under stricter and stricter supervision. Linda was torn between James and the children, finally left James, taking the two girls, and went to her mother's house. James and Linda began to attempt reconciliation and for several days Linda left the two girls at her mother's home while she tried to reconcile with James.
On October 5, 1987, the Department of Social Services received a complaint about the spanking James had given Renee in May and allegations concerning statements made by Linda to the children about sexual activities. Linda agreed that the custody of Gail and Renee be transferred to her mother, Mary Wilson. While the children were living with Mrs. Wilson, they began to date and go out with friends more often. James and Linda, who had now reconciled and were living together, feared that the two children would become sexually active. This concern manifested itself in increasing hostility between Mary Wilson, who was responsible for the two girls, and James and Linda, who were complaining about their supervision. This fear proved to be well founded because Renee did begin a sexual relationship during this period and for a time thought that she was pregnant. The feared pregnancy was reported to the Department of Social Services personnel who saw to it that Renee received the necessary medical treatment. The Readys were never informed of the feared *1254 pregnancy. Both Mrs. Wilson and the Readys complained to the Department of Social Services, and because of the increasing animosity, the Department of Social Services asked the Court to change the custody arrangement. Ultimately, both girls custody was transferred to the State, and the children were placed in a foster home.
James and Linda continued to suffer problems in their relationship, and during this period Linda became pregnant with Cody. Sometime in the middle part of March of 1988, Linda left James alleging that he had beaten her and sought shelter at the Y.W.C.A. battered women's shelter in Monroe, Louisiana. Linda denied at trial that James had beaten her. In any case, she left Cody with James.... Cody at the time was three months old. James enlisted the aid of his sister, Linda Dennis, to help in the care of Cody. A hearing was set to review the status of Gail and Renee for March 28, 1988. James and Linda again reconciled the day of the hearing.
Up until this point, all of the proceedings in the juvenile case had involved Renee and Gail only. The March 28 hearing was originally set as an adjudication hearing concerning Gail and Renee. By petition filed March 28, 1988, the same day as the hearing, which was not served upon either James or Linda Ready, Cody was included in these proceedings. The Readys testified they were unaware that Cody's custody would be at issue during these proceedings. James and Linda Ready were not represented by counsel and were not informed that they had a right to have counsel appointed to represent them. By Judgment rendered March 28, 1988, and signed May 23, 1988, custody of Gail and Renee was awarded to the Louisiana Department of Health and Human Resources, and the custody of Cody was awarded to Linda Dennis. The Department of Health and Human Resources was granted supervision of the Linda Dennis home for a period of six months. Gail, Renee and their mother were ordered to continue psychological counseling....Neither Gail nor Renee testified at the March 28 hearing.
The State made a home study of the Dennis home and reported back to the Court that the Dennis home was satisfactory. This was the last formal review that the State took concerning Cody's custody. The State began to experience problems with the two girls [Gail and Renee] almost immediately. They rebelled against the foster parents' attempts to discipline just as they had against James. The girls made more and more extreme accusations against James and Linda which they would later deny. Because of the difficulty at one of the foster homes, they were transferred to a second foster home. Finally, in June of 1989, the two girls ran away from the second foster home. The State then obtained an order releasing Gail and Renee back to the custody of their mother, Linda Wilson Ready. The order made no provisions for Cody. It is apparent that by July of 1989, the State had come to the realization that Gail and Renee had lied about the allegations of misconduct against James and Linda. If this was not the case, the Court cannot envision the State returning custody of the two girls to the Readys. The State took no further action to return Cody to the custody of James and Linda.
The relationship between the Readys and Linda Dennis quickly deteriorated after March of 1988 and became very hostile.... The Readys began to make more and more vehement protests about Cody's custody with the various Department of Social Services personnel. As time went on, Mrs. Dennis became more and more restrictive in allowing the Readys to see and communicate with Cody. In an attempt to be close to her son, Linda took a volunteer job at the Sicily Island Head Start program where Cody attended. Mrs. Dennis directed the teachers not to allow Linda Ready to communicate in any manner with Cody. Mrs. Gloria Price, the teacher, testified that this caused Cody quite a bit of anguish.
During the time Mrs. Dennis had custody of Cody her marriage also deteriorated. She began to have an adulterous relationship with Ronnie Bixford. John Dennis, Mrs. Dennis' husband, worked at night, *1255 and once he left for work, she would take Cody and go to Mr. Bixford's home. She would make Cody a pallet in Mr. Bixford's bedroom and she and Mr. Bixford would occupy the bed in the same room. Although she denies that she had any sexual relations with Mr. Bixford while Cody was in the bedroom, the Court finds to the contrary.
Linda and James married on April 29, 1988, and Kimberly was born on October 29, 1988. She has remained in the Readys' custody since her birth. Complaints were made to the Department of Social Services about Kimberly but these complaints were determined to be groundless and Kimberly continued to live with James and Linda. During one of the visitations the Readys had with Cody, he was caught engaging in deviant sexual activity with three year old Kimberly. During other visits he made sexual advances toward her. Dr. Stewart Kutz testified that the activity Cody was engaged in was abnormal for a child of his age and understanding and would have probably resulted from the child witnessing others performing these activities. The Court determines by preponderance of the evidence that Linda Dennis, while she had custody of Cody, exposed Cody to deviant sexual practices which manifested themselves in his assault upon his three year old sister.
The Readys maintain and the State acknowledges that they made complaints about the Dennis home environment, but after investigation the State took no action to remove Cody from Mrs. Dennis' custody. Gloria Taylor, a State case worker, stated that because the Readys had complained so much and were so hostile, the local Catahoula Parish officials were directed not to investigate these complaints. Instead these complaints were turned over to an adjacent parish office for investigation. The Readys stated that they believed the State would ultimately return Cody's custody to them as they had the custody of Gail and Renee. The Readys have few economic resources, but eventually they were able to employ a private attorney and instituted custody proceedings in 1992 and regained custody of Cody in March of 1993. The Readys had very little contact with Cody during the five year period that Mrs. Dennis had custody.
James Ready is an itinerant roofer who moves from state to state following natural disasters which necessitate extensive roofing repairs. After the March 28 hearing, he lived in several states including Colorado, Alabama and South Carolina. At all times he maintained a residence in the Sicily Island area and would return to Sicily Island when jobs played out. After Renee and Gail were returned to the Readys' custody, James' relations with Renee improved. At the same time that his relationship with Renee was improving his relationship with Gail was deteriorating. The Readys moved to South Carolina in September of 1989, Renee married and left the Ready home. Gail moved with James and Linda along with Kimberly to South Carolina. Gail ran away from home while the Readys were in South Carolina and became involved with South Carolina child protection authorities. The Readys returned to Louisiana in August 1990 and Gail followed soon after. Upon her return to Louisiana, she made additional allegations against James to the Department of Social Services alleging that he had raped her. The Department of Social Services reported this allegation to the Catahoula Parish District Attorney's office who took no action. Because of Gail's accusations, James and Linda separated again but again reconciled.

PRESCRIPTION
DHHR argues that all of the Readys' claims, including Kimberly's, have prescribed.[5] It contends that the trial court removed Cody from the Readys' custody on March 28, 1988, that the damages alleged all stem from that date, and that this damage action was not filed until April 27, 1993. In opposition the Readys contend that the removal *1256 of Cody constituted a continuous tort and that prescription did not begin to run against them until Cody's custody was restored to them. The Readys further contend that the three year prescriptive period provided in La.Civ.Code art. 3496.1 is applicable, and that prescription did not begin to run until March 21, 1994, when they were given records of the March 28, 1988, hearing, which revealed the procedural irregularities which form the basis of their due process claim.
Liberative prescription runs against all persons, including minors, unless exception is established by law. La.Civ.Code arts. 3467, 3468; Bouterie v. Crane, 616 So.2d 657 (La.1993). The one-year liberative prescription period for delictual actions begins to run from the date the injury or damages is sustained. La.Civ.Code art. 3492; Bouterie, 616 So.2d at 660. Although prescriptive statutes are generally construed strictly against prescription, when a petition reveals on its face that prescription has run, the plaintiff bears the burden of proving why the claim has not prescribed. Doe v. Doe, 95-0006 (La.App. 1 Cir. 10/6/95); 671 So.2d 466.
When tortious conduct and resulting damages are of a continuing nature, prescription does not begin until the conduct causing the damages is abated. Bustamento v. Tucker, 607 So.2d 532 (La.1992). However, it is also well established that the principle of a continuing tort applies only when continuous conduct causes continuing damages. Laughlin v. Breaux, 515 So.2d 480 (La.App. 1 Cir.1987). Continuing damages do not suffice to create a continuing tort; there must also be continuing acts of fault. National Council on Compensation Ins. v. Quixx Temporary Services, Inc., 95-0725 (La.App. 4 Cir. 11/16/95); 665 So.2d 120. Accordingly, in order to allege a continuing tort, the plaintiffs must allege both continuous action and continuous damage. Chiasson v. Doe, 618 So.2d 38 (La.App. 3 Cir.), writ den'd, 624 So.2d 1225 (La.1993); Crawford v. Howard, 539 So.2d 735 (La.App. 3 Cir.), writ den'd, 541 So.2d 840 (La.1989).
Viewing the Readys' individual claims for damages as well as their claim on behalf of Cody, it is evident, in light of the jurisprudence, that these claims have prescribed.
Assuming arguendo that there was a denial of due process in the present case, it is clear that the delictual conduct of DHHR occurred at the March 28, 1988, hearing. It is equally evident from the record that no conduct in violation of the constitution on the part of DHHR occurred afterwards. Even if Cody may have suffered damages after March 28, 1988, as a result of the denial of due process, there was no continuing conduct on the part of DHHR which would call the "continuing tort" exception to prescription into play.
We likewise find that the Readys' reliance upon La.Civ.Code art. 3496.1 is misplaced. From the outset we note that this case does not involve the sexual abuse of Cody. Moreover, the amendments to La.Civ. Code art. 3496.1 were enacted in 1992 to include claims against non-parents. Whatever claims the Readys may have had against DHHR were prescribed prior to the enactment of this amendment. As held in Wimberly v. Gatch, 93-2361 (La.4/11/94); 635 So.2d 206, the amendment to La.Civ.Code art. 3496.1 could not operate retroactively to revive an already prescribed cause of action for sexual abuse of a minor.
Lastly, in an oblique manner the Readys contend that contra non valentem should operate to defeat the peremptory exception of prescription. In the furtherance of their position, the Readys contend that they did not know until 1994 that the State had violated their due process rights.
If there were due process errors involving the March 28 hearing, the record affirmatively shows that the Readys understood that Linda Dennis' custody of Cody was only for six months. Linda Ready testified that shortly after the March 28 hearing, she met with the juvenile court judge who told her that Cody would only be temporarily in the custody of Linda Dennis. Likewise, Mr. Ready stated that he understood that it was wrong to grant custody of Cody to Linda Dennis. He further stated that he also understood that Linda Dennis would only have Cody for six months. It is clear that although the Readys had knowledge of all of the acts of DHHR prior to 1994 and disagreed with the temporary placement, they neither sought a new trial, nor filed for an *1257 appeal, and they did not seek legal counsel. Accordingly, we find no merit to the Readys' argument that contra non valentem was applicable.
We now turn our attention to the Readys' claim on behalf of Kimberly. With regard to Kimberly's claim for damages as a result of her loss of companionship of Cody, we find our foregoing analysis applicable.
Referring, however, to Kimberly's damage claim based upon Cody's sexual abuse of her, we find another analytical tact is required. Our careful review of the record reveals no specific date on which Cody allegedly abused Kimberly. At best it is said that Cody (d.o.b 12/8/87) was four years of age and Kimberly (d.o.b.10/29/88) was three years of age. On this information, the sexual abuse of Kimberly would have occurred between 12/8/92 and 10/29/92. Thus, it is possible that the Readys' law suit filed on behalf of Kimberly on 4/27/93 may have been timely.
Notwithstanding, we find no basis in tort to hold DHHR liable to damages Kimberly suffered at the hands of Cody. It is of fundamental importance to note that unless DHHR had custody of Cody or had control over his custodial environment, there is no reason to impose upon it a corresponding duty to assume responsibility for his safety and well-being, and to find it liable for damages he may have caused his sister. As stated earlier in this opinion, Cody was never placed into the custody of DHHR; instead he was placed into the custody of his aunt, Linda Dennis. As ordered by the juvenile court, DHHR only had supervisory jurisdiction over the Linda Dennis home for the initial six month period of Cody's residing in that home.
In seeking to attribute a duty to DHHR beyond the original six-month period of supervision, the Readys contend that DHHR had a duty under former La.R.S. 46:2427(E)[6] to conduct a dispositional hearing for Cody every twelve months.
After carefully reading La.R.S. 46:2427, we find that the Readys' reliance on paragraph (E) is misplaced. Instead of creating a general duty for children placed into the custody of relatives, we find that paragraph (E) must be read in pari materia with paragraphs (A) and (D). After reading this statute as a whole, it is clear that paragraph (E) is limited to those children who were first placed into foster care or under the custody of DHHR and who were later placed into the *1258 care of relatives as provided in paragraph (D). Thus, we cannot find that La.R.S. 46:2427(E) created a statutory duty on the part of DHHR as espoused by the Readys.
It is clear in the case sub judice that the harms Cody suffered, vis-a-vis his exposure to deviant sexual conduct, did not occur while he was in DHHR's custody; rather this harm was perpetrated on Cody when he was in the custody of his aunt. Moreover, the record is void of any evidence that DHHR was alerted to any incidents where Linda Dennis was exposing Cody to sexual activity. Having found no duty owed by DHHR to Cody in this setting, we further find that the trial court erred as a matter of law in awarding damages against DHHR for sexual abuse Cody perpetrated against his sister.
For the foregoing reasons, the judgment of the trial court is reversed and set aside. The Readys' petition is dismissed with prejudice. Costs of this appeal are assessed to the Readys.
REVERSED AND RENDERED.
YELVERTON, J., concurs and assigns reasons.
COOKS, J., dissents.
SAUNDERS, J., dissents without written reasons.
YELVERTON, Judge, concurring.
There is an additional reason why I think the judgment should be reversed. That reason is that there were never any actionable claims to start with.
The Readys pleaded and the trial judge awarded damages under § 1983 and labeled all the claims together as "due process" violations. In his reasons for judgment he based all liability squarely on the finding of a violation of due process, saying "[a] denial of due process by any governmental entity is a tort under Louisiana law and gives right to a suit for damages resulting from that denial." This reason for judgment was not only the factual basis for his § 1983 punitive damages award, but also for his compensatory awards under Louisiana tort law. I believe that this finding was error.
The trial judge did not mention Louisiana's due process clause, La. Const. art. I, § 2, as a legal basis for his opinion. Instead, he relied entirely and at length on federal § 1983. His award of punitive damages, not otherwise available under Louisiana law, clearly shows that his award was based on § 1983. The trial judge's opinion, however, did not distinguish, as the federal courts have so often done, between § 1983 claims for violations of procedural due process rights and substantive due process rights. When that distinction is made and applied to this case, it becomes readily apparent that the plaintiffs in this case have not suffered the denial of due process. Hence, no tort claims based on a denial of due process ever came into existence.

I. Procedural Due Process Violation
The Due Process Clause of both the United States Constitution and the Louisiana Constitution prohibit the deprivation of "life, liberty, or property" without due process. Parents have a constitutionally protected liberty interest in the care and custody of their children. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). However, this liberty interest is not absolute. In some instances, the state may deprive a parent of custody, but only pursuant to constitutionally adequate procedures. Procedural due process is concerned exclusively with the means or procedures used by the state to effect the deprivation of a fundamental right and is satisfied by the "opportunity to be heard `at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). The Readys were deprived of a constitutionally protected liberty interest but that does not necessarily mean that the state used constitutionally inadequate procedures. The inquiry extends not only to what procedures were employed by the state to effect this deprivation, but also to whether there were available post-deprivation procedures and remedies and whether these were constitutionally adequate.
Justice Knoll has assumed arguendo that the trial judge in this damage suit was correct in his holding that the March 28, 1988 hearing, which awarded Cody's custody to his aunt, was constitutionally infirm. This assumption may well be a fact. The DHHR *1259 was not faced with an emergency situation as Cody was not physically living with his parents at the time and was not in imminent danger. Thus, the trial court in 1988 had no statutory authority to deprive the Readys of custody prior to a properly noticed hearing. Several federal courts have held that a child welfare agency, acting pursuant to state emergency procedures, does not deprive a parent of procedural due process by immediately removing a child without a pre-deprivation notice or hearing, if certain post-deprivation procedures are strictly followed. Donald v. Polk County, 836 F.2d 376 (7th Cir.1988); Jordan by Jordan v. Jackson, 15 F.3d 333 (4th Cir.1994); and Campbell v. Burt, 949 F.Supp. 1461 (D.Hawai'i 1996). But this was not an emergency procedure. Therefore, the Readys should have been provided with adequate notice that Cody's custody would be decided at the March 28, 1988 hearing and given a reasonable opportunity to prepare a defense. When DHHR filed the custody petition on the same day as the hearing and served the Readys only moments before the hearing, DHHR failed to satisfy the requirements of procedural due process. While I believe the trial judge in this damage suit was correct in holding that DHHR failed to follow proper procedures surrounding the March 28, 1988 hearing that determined Cody's custody, the due process analysis does not end at that point.
In Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the United States Supreme Court set forth the complete procedural due process analysis when a state actor deprives a person of a liberty interest. The Zinermon plaintiff had been confined to a mental hospital, as a voluntary mental patient, but lacked competency to give informed consent. The court distinguished between substantive and procedural due process violations. Violations of substantive constitutional rights are complete and actionable at the moment the wrongful deprivation occurs, and the existence of state post-deprivation remedies are irrelevant to the litigant's ultimate success. But violations of procedural due process rights are not complete when the deprivation occurs; they are not complete "unless and until the State fails to provide due process." Zinermon, at 126, 110 S.Ct. at 983. Unlike violations of substantive rights, the existence of post-deprivation remedies are relevant in a procedural due process claim.
The Zinermon analysis explained that if adequate remedies for erroneous deprivations exist under the state statutory or tort law and if the unconstitutional deprivation was the random and unauthorized act of state officials (not pursuant to state law), then the state has provided all the process that is due. Hence, no actionable violation of procedural due process has occurred. The Zinermon analysis is an extension of the Parratt-Hudson doctrine to specifically include deprivations of liberty interests. Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Prior to Zinermon, the Parratt-Hudson doctrine applied to deprivations of property, whether intentional or negligent, and provided that random, unauthorized deprivations did not violate procedural due process if adequate post-deprivation remedies existed under state law. While the Zinermon court expanded the Parratt-Hudson doctrine to include deprivations of liberty interests, it limited that doctrine somewhat by refusing to apply it when the state vests in one state actor both the power to deprive the plaintiff of his liberty interest and the power to provide pre-deprivation process. This limitation is not relevant in the present case because it was the trial judge, as neutral decision-maker, who possessed the ultimate power to deprive the Readys of their liberty interest, not DHHR.
I think the Zinermon analysis applies to the present case and defeats the Readys' procedural due process claim. The Readys do not argue that the procedural safeguards provided by state statutes were constitutionally inadequate. Instead, they claim that DHHR officials violated the statutory law and, as such, these were unauthorized acts by state officials. The statutory law clearly provided post-deprivation procedures and remedies. The Readys could have appealed the March 28, 1988 decision that removed Cody from their custody. These procedures and remedies were provided in 1988 by La. Code Juv.P. art. 98, now La.Ch.Code art. *1260 331. Yet, they chose not to appeal. At any time subsequent to the 1988 judgment, the Readys could have filed a Motion to Modify Judgment of Disposition. This right was available to plaintiff under La.Code Juv.P. art. 9, now La.Ch.Code art. 714. Instead, the Readys waited four years to take legal action; finally, in 1992 they hired an attorney and instituted custody proceedings.
The state statutory scheme provided the Readys a post-deprivation opportunity to be heard and to correct any erroneous or unfair deprivation of their liberty interest. Conceivably, they could have regained the legal custody of Cody, assuming a court determined that DHHR had no basis for removing Cody. I think the state provided the Readys due process by virtue of the post-deprivation remedies discussed above. The fact that the Readys failed to take advantage of these available remedies is irrelevant to whether the state provided adequate due process. I conclude that the Readys did not have an actionable procedural due process claim.
In a child custody context, there have been several federal courts that employed the same above analysis to dismiss the procedural due process claims filed by parents, deprived of custody and/or visitation rights, against child welfare officials. I will cite four. Fitzgerald v. Williamson, 787 F.2d 403 (8th Cir.1986); Pfoltzer v. County of Fairfax, 775 F.Supp. 874 (E.D.Va.1991); Fanning v. Montgomery Cty. Children & Youth Serv., 702 F.Supp. 1184 (E.D.Pa.1988); and Haag v. Cuyahoga County, 619 F.Supp. 262 (D.C.Ohio 1985). These cases held that the availability of adequate post-deprivation remedies satisfied procedural due process, notwithstanding that pre-deprivation process was bad. The various federal courts examined the state statutory schemes and similarly concluded that either one or several of the following state procedural safeguards provided adequate post-deprivation remedies, thus satisfying due process: 1) the right to appeal a judgment concerning custody; 2) the right to petition, at any time, for modification of custody or visitation orders; and 3) the right to request a continuance if unable to attend a hearing. At least one state court has held that the availability of an adequate post-deprivation remedy precluded a procedural due process claim filed against a social worker who failed to give notice before changing a juvenile's placement. Jones v. Dane County, 537 N.W.2d 74, 195 Wis.2d 892 (App.1995), review denied, 540 N.W.2d 200 (Wis.S.Ct. 1995).

II. Substantive Due Process Claim
In Gilmere v. City of Atlanta, Ga., 774 F.2d 1495, 1500 (1985), the federal court succinctly explained the difference between procedural and substantive due process claims:
Unlike procedural due process claims, which challenge the adequacy of the procedures used by the government in deciding how to treat individuals, substantive due process claims allege that certain governmental conduct would remain unjustified even if it were accompanied by the most stringent of procedural safeguards. Such substantive claims are outside the scope of Parratt because the constitutional violation is complete at the moment when the harm occurs. The existence of state postdeprivation [sic] remedies therefore has no bearing on whether the plaintiff has a constitutional claim.
I have already mentioned the settled law that while a parent's right to custody is a constitutionally protected liberty interest, the right has limitations. Clearly, the state, as parens patriae, may interfere with a parent's custody under certain circumstances such as abuse and neglect. No precise standards exist to determine what governmental actions violate substantive due process. In the context of child custody, several courts have applied the "shock the conscience" standard when evaluating the state action at issue. One such case is Pfoltzer, 775 F.Supp. 874, wherein the court discussed the "shock the conscience" standard and cases from other courts that had applied that standard to determine if child welfare authorities had violated substantive due process.
It does not shock my conscience to learn that in March 1988 when DHHR initially interfered with Cody's custody it was trying to protect a child whose father had been accused of sexually abusing two young girls and whose mother had fled to a battered women's shelter. The fact that DHHR may have been mistaken, in hindsight, or that the *1261 accusations turned out to be false, is irrelevant. Our society charges DHHR with the duty to act on allegations of abuse, and we recognize that caseworkers lack omniscience when making these difficult child custody decisions. Based on the facts available in 1988, DHHR and its caseworkers used their professional judgment and made an entirely reasonable decision to remove Cody from the Readys' custody. Whether under a § 1983 action or a state tort claim, DHHR and its agents did not violate any substantive rights or standards of care when they removed Cody from the Readys' custody in 1988.
For these additional reasons it is my opinion that the plaintiffs' have not proved a right to damages under any law, federal or state. If I am wrong about this, however, and if the plaintiffs ever had claims for damages, then I fully agree with Justice Knoll that the judgment must be reversed because those claims have prescribed.
Before YELVERTON, COOKS, SAUNDERS, DECUIR and PICKETT, JJ.

ON REHEARING
PICKETT, Judge.
The plaintiffs filed an action against the State of Louisiana, through the Department of Health and Human Resources (DHHR), pursuant to 42 U.S.C.A. § 1983 for wrongful removal of their child from their custody. The trial court found DHHR liable for damages resulting from its wrongful removal for the plaintiffs' son, James Cody (Cody). After DHHR appealed, this court reversed and set aside the judgment of the trial court, and dismissed the plaintiffs' petition with prejudice after finding that the action was time-barred. Subsequently, we granted plaintiffs' application for rehearing.
In their application for rehearing, the plaintiffs contend that this court erred in failing to recognize that prescription was interrupted for Cody's claims until custody and the legal right to bring suit on his behalf was vested in someone other than the tortfeasor. The plaintiffs further contend that this court erred in failing to consider whether any of their causes of action, other than procedural due process, had prescribed. We granted the rehearing for the limited purpose of considering these claims.
The facts of this case were discussed at length in the majority opinion on original hearing in Ready v. State, Department of Health and Human Resources, 95-1564 (La. App. 3 Cir. 6/25/97), 707 So.2d 1250. Both the issue of prescription as to Cody's claims, and the issue of prescription as to all of the plaintiffs' claims were carefully considered in the original opinion. After a review of the record and the original opinion, we conclude, for the same reasons, that Cody's claims and the plaintiffs' claims have prescribed.
Accordingly, for the reasons set forth in our original opinion, the judgment of the trial court is reversed and set aside. The plaintiffs' petition is dismissed with prejudice. The plaintiffs are assessed with all costs of this appeal.
REVERSED AND RENDERED.
COOKS, J., dissents.
YELVERTON, J., concurs for reasons previously assigned.
NOTES
[1] Justice Jeannette T. Knoll is sitting in this matter pursuant to a temporary assignment by the Louisiana Supreme Court as judge ad hoc of the Third Circuit Court of Appeal.
[2] At the time that Cody was born and later when he was removed from their custody, James Ready and Linda Wilson were not married. They were not married until April 29, 1988. Nevertheless, for clarity and simplicity, we will refer to them as the Readys.
[3] While this case was pending on appeal, Linda Ready died. Upon motion of her husband, her succession representative was substituted as a party plaintiff. For clarity, however, we will refer to her in the text of the opinion.
[4] Because of our resolution of this case on prescription and related tort theory grounds, we address assignments of error 1 and 5 only.
[5] We find no merit to the Readys' contention that the issue of prescription is not before the court because DHHR failed to make the hearing on the peremptory exception a part of the appellate record. The pleadings and the detailed evidence from the trial on the merits is before us and provide a complete record with which to judge the exception.
[6] La.R.S. 46:2427 was repealed by Acts 191, No. 235, § 235, eff. January 1, 1992. Former La. R.S. 46:2427 provided, in pertinent part:

A. The court shall conduct a dispositional review hearing at least once every twelve months after the child, pursuant to a child in the need of care proceeding, is placed in foster care or enters the custody of the department, whichever is earlier, or upon the request of the department, an agency or institution directly responsible for care or placement of the child, a parent, a mature child through his attorney, or upon its own motion. The court shall schedule the hearing as soon as possible after receiving a request.
* * * * * *
C. The clerk of court shall notify the parties listed in Subsection A of this Section and other parties of interest. Such notice shall state the time and place of the review. The department shall, upon the request, provide the clerk of the court with information concerning the whereabouts and identity of such parties.
D. The court shall enter an order within twenty days of the review hearing. The order shall include a determination on:
(1) Whether or not the child should be returned to the parent.
(2) Whether or not the child should be placed for adoption, including whether a termination of parental rights proceeding should be initiated.
(3) Whether the child shall continue in foster care or department custody, or both, for a specified period.
(4) Whether the child, because of his special needs or circumstances, should be placed in the custody of a responsible relative or individual on a permanent basis or should continue in foster care or department custody, or both, on a permanent or long term basis.
E. If the court determines that the child should be placed in the custody of a relative or responsible individual or continued in foster care or department custody, or both, it shall include written findings specifying why return home or termination of department custody, or both, or another permanent placement is not possible. If the current placement is not expected to be permanent, the court shall specify a projected timetable for return home or another permanent placement. If the timetable set forth by the court is not met, the department shall promptly notify the court and the parties listed in R.S. 46:2427(A).